516 S.E.2d 748

**William HARMON and Thomas Chiles, Sr., Petitioners below, Appellants,**

v.

**FAYETTE COUNTY BOARD OF EDUCATION, Respondent below, Appellee.**

**No. 25323.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 13, 1999.

Decided March 12, 1999.

Dissenting Opinion of Justice McGraw July 21, 1999.

---

Barry L. Bruce, Esq., Lewisburg, West Virginia, Attorney for Appellants.

Erwin L. Conrad, Esq., Conrad Law Offices, Fayetteville, West Virginia, Attorney for Appellee.

STARCHER, Chief Justice:

In the instant case, we uphold a decision by the Circuit Court of Fayette County, ruling that an attendance officer and his assistant, employees of the Fayette County Board of Education, are not entitled to receive a $600.00 annual pay supplement that the Legislature has said must be paid to "classroom teachers" who have at least 20 years of teaching service.

### I.

#### Facts & Background

This case arises from a decision by an administrative law judge ("ALJ") of the West Virginia Education and State Employees Grievance Board ("EEGB"), ruling on a grievance filed by the appellants, William Harmon ("Mr. Harmon") and Thomas Chiles ("Mr. Chiles"), under the school personnel grievance procedures established in *W.Va. Code*, 18–29–3 [1992].

The appellants are employees of the appellee, the Fayette County Board of Education ("the Board"). Mr. Harmon is employed as the Board's "attendance director." Mr. Chiles is employed as an assistant to Mr. Harmon, and is called an "attendance officer." We shall refer to both appellants as "attendance employees."

The appellants claimed in their grievance that the Board had violated *W.Va.Code*, 18A–4–2(b) [1998] by having not paid to the appellants the $600.00 annual salary supplement that this statute requires to be paid to "classroom teachers" who have at least 20 years of teaching experience.[1] The appellants sought as relief in their grievance the retroactive payment of the supplement for all years that the appellants did not receive the supplement, since the time each of them attained 20 years of service with the Board.

The ALJ concluded that the appellants were not entitled to the retroactive supplemental pay, because the appellants were not "classroom teachers" who are statutorily entitled to the supplement. The ALJ also rejected the appellants' claim that they were entitled to prevail in their grievance, and therefore to receive the retroactive supplemental pay, due to a procedural default resulting from the Board's untimely issuance of a decision at a lower level in the grievance process.

The appellants appealed the ALJ's decision to the Circuit Court of Fayette County. The circuit court upheld the ALJ's decision, and the instant appeal by the appellants to this Court followed.

Having set forth the foregoing summary of the facts and background of the instant case, we next state the applicable standard of review. We then discuss the issues; we in-

---

1. *W.Va.Code*, 18A–4–2(b) [1998] states, in pertinent part:

Six hundred dollars shall be paid annually to each classroom teacher who has at least twenty years of teaching experience. The payments: (i) Shall be in addition to any amounts prescribed in the applicable state minimum salary schedule; (ii) shall be paid in equal monthly installments; and (iii) shall be considered a part of the state minimum salaries for teachers.

clude additional facts as needed in that discussion.

## II.

### Standard of Review

■ We review the decision of the circuit court under the same standard that the circuit court applies to the ALJ's decision: in matters of fact, we are deferential to the tribunal that heard the evidence; in matters involving the interpretation and application of law, our review is *de novo*. *Martin v. Randolph County Board of Education*, 195 W.Va. 297, 304, 465 S.E.2d 399, 406 [1995].

## III.

### Discussion

#### A.

### Is an Attendance Employee a "Classroom Teacher?"

■ The appellants contend that their positions as attendance employees should be properly classified within the category of "classroom teacher," thus requiring the payment to the appellants of the statutory salary supplement. The ALJ and circuit court ruled that the appellants' positions were not properly classified within the "classroom teacher" category.

2. In the instant case, the ALJ concluded that the appellants were *not* "school personnel" subject to Chapter 18A—because attendance employee positions are created in a separate statutory chapter, Chapter 18. *See W.Va.Code*, 18–8–1 to –11.

It is true that the attendance employee position historically known as "truant officer" is statutorily created in a different fashion than are other school board employee positions—and attendance employees have historically had different conditions of employment. *Id.* For example, until 1997, a county board of education had apparently unlimited discretion in hiring and firing attendance employees. *W.Va.Code*, 18–8–3 [1986] [amended 1997]. And until 1997, *W.Va. Code*, 18–8–6 [1951] [repealed 1997] provided for criminal penalties for attendance employees who failed to perform their duties.

However, attendance employees who hold a West Virginia teacher's certificate are included in the definition of "teacher members" in *W.Va. Code*, 18–7A–3 [1986], governing the state teachers' retirement system. ("Classroom teachers" are also separately included in this definition. *Id.*) The record in this case indicates that the

We begin our discussion of this issue with the principle that *all* personnel employed by a board of education are "school personnel." [2] School personnel are further classified as either "professional personnel" or "service personnel." *W.Va.Code*, 18A–1–1(a) [1997] states:

(a) "School personnel" means *all personnel employed by a county board of education* whether employed on a regular full-time basis, an hourly basis or otherwise. School personnel shall be comprised of two categories: Professional personnel and service personnel.

[Emphasis added.]

"Professional personnel," in turn, are school personnel who are required to have professional certification. *W.Va.Code*, 18A–1–1(b) [1997] states:

(b) "Professional personnel" means persons who meet the certification and/or licensing requirements of the state, and shall include the professional educator and other professional employees.

One of the two categories of "professional personnel" is "professional educator"—a term that generally means the same thing as a "teacher." *W.Va.Code*, 18A–1–1(c) [1997].

appellants were required to have professional educational certification for their jobs as attendance employees. *W.Va.Code*, 18A–1–2 [1969] states that it repeals by implication existing conflicting provisions of the law that are inconsistent with Chapter 18A. *Smith v. Siders*, 155 W.Va. 193, 200, 183 S.E.2d 433, 437 (1971). Additionally, Chapters 18 and 18A are to be read *in pari materia*. *Id.*, 155 W.Va. at 201, 183 S.E.2d at 437; *see also State ex rel. Boner v. Kanawha County Bd. of Educ.*, 197 W.Va. 176, 183, 475 S.E.2d 176, 183 (1996).

In light of the foregoing discussion, and the clear language of *W.Va.Code*, 18A–1–1(a) [1997] ("*all* personnel employed by a county board of education"), we must reject the ALJ's conclusion that attendance employees are not "school personnel" as defined in Chapter 18A. We proceed on the premise that the appellants are school personnel who are subject to the definitions and distinctions in Chapter 18A. We express no opinion as to the proper resolution of any other possible conflicts between provisions of *W.Va. Code*, 18–8–1 to –11 and Chapter 18A, regarding terms and conditions of employment for attendance employees.

The other category of "professional personnel" is "other professional employee."

The category of "professional educator" is divided into four subcategories: "classroom teacher," "principal," "supervisor," and "central office administrator." *W.Va.Code,* 18A–1–1(c) [1997] states:

(c) "Professional educator" shall be synonymous with and shall have the same meaning as "teacher" as defined in section one, article one, chapter eighteen of this code. Professional educators shall be classified as:

(1) "Classroom teacher"—The professional educator who has direct instructional or counseling relationship with pupils, spending the majority of his time in this capacity.

(2) "Principal"—The professional educator who as agent of the board has responsibility for the supervision, management and control of a school or schools within the guidelines established by said board. The major area of such responsibility shall be the general supervision of all the schools and all school activities involving pupils, teachers and other school personnel.

(3) "Supervisor"—The professional educator who, whether by this or other appropriate title, is responsible for working primarily in the field with professional and/or other personnel in instructional and other school improvement.

(4) "Central office administrator"—The superintendent, associate superintendent, assistant superintendent and other professional educators, whether by these or other appropriate titles, who are charged with the administering and supervising of the whole or some assigned part of the total program of the county-wide school system.

(d) "Other professional employee" means that person from another profession who is properly licensed and is employed to serve the public schools and shall include a registered professional nurse, licensed by the West Virginia board of examiners for registered professional nurses and employed by a county board of education, who has completed either a two-year (sixty-four semester hours) or a three-year (ninety-six semester hours) nursing program.

This Court has recognized that these four subcategories within the overall category of "professional educator" are not easy to apply in some cases.

In *Putnam County Board of Educ. v. Andrews,* 198 W.Va. 403, 481 S.E.2d 498 [1996] (*per curiam* ), Ms. Andrews, a school board employee, sought "administrative seniority" credit for her work as an educational diagnostician. She claimed that she had earned this administrative seniority credit either as a "central office administrator" or as a "supervisor."

However, the board of education contended that Ms. Andrews' educational diagnostician work was properly classified, for seniority purposes, as "classroom teacher" work—so that she was not entitled to administrative seniority credit.

This Court held on appeal that Ms. Andrews was not entitled to administrative seniority credit. We noted that Ms. Andrews' work as an educational diagnostician primarily involved testing individual students for learning disabilities, etc.—and then participating in meetings to develop educational plans for the students. We concluded that for seniority purposes the "classroom teacher" classification was the most applicable to Ms. Andrews' work.

We agreed with the board that while Ms. Andrews' educational diagnostician duties might not on first glance fit comfortably within the definition of "classroom teacher," it is clear that the definition focuses on the duties or work performed, rather than the location of the performance. Furthermore, a review of the alternatives [supervisor, principal, or central office administrator] reinforces our conclusion. 198 W.Va. at 408, 481 S.E.2d at 503.

We noted that Ms. Andrews' work did not fit well in the "supervisor" or "central office administrator" subcategory definitions. Because she primarily worked directly with students; because any administrative duties she had were similar to those engaged in by more traditional classroom teachers; and be-

cause there was no more suitable subcategory for her work—we affirmed Ms. Andrews' classification, for seniority purposes, as a "classroom teacher."

■ From the *Andrews* case, we can take the principle that the degree to which a professional educator directly works with students, regardless of the location of such work—and the suitability of alternative classifications—are two important factors in determining whether a professional educator should be classified as a classroom teacher.[3]

3. We have recognized that the careful use of the term "classroom teacher" by the Legislature indicates that a statute is not directed at "professional educators/teachers" generally, but at employees who meet the specific criteria of the "classroom teacher" definition. *See Pockl v. Ohio County Bd. of Educ.*, 185 W.Va. 256, 259, 406 S.E.2d 687, 690 (1991).

*Andrews* is apparently our only case directly addressing how to apply the subcategories contained within the professional educator category, and no case has considered how the "attendance employee" position fits within the statutory framework.

However, our research has identified one case, *State ex rel. Pemberton v. Wilson*, 481 S.W.2d 760 (Tenn.1972), in which the Tennessee Supreme Court of Appeals dealt with a transfer of an employee from the job of "attendance teacher" to a classroom teaching position. The Tennessee court stated:

The position of Attendance Teacher is an administrative or supervisory position of county-wide scope and the Attendance Teacher is a member of the staff of the County Superintendent. Some of the duties of the position include taking the school census, investigation of all illegal pupil absences, and the assistance of students lacking sufficient wearing apparel by the cooperation with civic and welfare agencies to obtain these necessities in order to reduce pupil nonattendance, all under the supervision of the County Superintendent. The position does not require the teaching of pupils in a classroom.

The duties of a Classroom Teacher are exactly those which the name implies. It is not an administrative or supervisory position.

4. The appellants also direct us to changing positions taken by the state superintendent of education on the question of whether attendance employees are or are not classroom teachers who are entitled to receive the classroom teacher supplement.

In a February 1990 letter to a Jefferson County school official the state superintendent wrote:

February 6, 1990
Mr. George R. Frame
Associate Superintendent

The appellants, in support of their contention that they are "classroom teachers" who are entitled to receive the $600.00 annual supplement, direct us to their employment contracts, that are written on standard "teacher" employment contract forms. The appellants also point out that during their many years as attendance employees, they have been paid according to "teacher" pay scales. (In 1995–96 Mr. Harmon made $39,-280.50 as Attendance Director. In 1995–96, Mr. Chiles made $37,971.58 as an Attendance Officer.)[4]

Personnel/Public Information
Jefferson County Schools
Post Office Box 987
Charles Town, West Virginia 25414
Re: *COUNTY ADMINISTRATOR $600 TEACHING INCREMENT*
Dear Mr. Frame:

You have asked whether two instructional specialists who are assigned to the board office, yet spend much of their time in classrooms dealing with instruction, are entitled to the annual $600 .00 salary supplement granted by W.Va.Code 18A–4–2 ". . . to each classroom teacher who has at least twenty years of teaching experience."

Probably not, because their job description has them doing very little teaching. Their teaching seems limited to PERFORMANCE STANDARDS: 2(E). If, however, they actually do spend most of their time helping to teach class, notwithstanding the language of their job's description, then they appear to be entitled to this supplement.

The reason why school counselors, school psychologists, social service *and attendance workers* and librarians are due this supplement—as well as classroom teachers—is that they work directly with school children, rather than working through other personnel (as, for example, principals do).

Hoping that I have been of service, I am,
    Sincerely,
    Henry Marockie
    State Superintendent of Schools
cc: Dr. Robert Ingram
    Superintendent
    Jefferson County Schools
[Emphasis added.]

On December 5, 1996, the state superintendent wrote to the Board in the instant case:

December 5, 1996
Mr. K.R. Carson
Interim Superintendent
Fayette County Schools
111 Fayette Avenue
Fayetteville, West Virginia 25840
Dear Mr. Carson:

This is in response to the letter from Dr. Capehart of September 30, 1996, requesting an

However, these facts bear little weight on the issue before this Court. As previously noted, "teacher" is a broad term that is generally synonymous with "professional educator." *W.Va.Code*, 18A–1–1(c) [1997]. While a "classroom teacher" is necessarily a "teacher," the reverse is not true. The fact that the appellants have been classified and treated as "teachers" does not weigh on behalf of their being specifically classified as "classroom teachers."

The duties of attendance employees are set out in *W.Va.Code*, 18–8–4 [1997].[5]

interpretation from our office regarding the six hundred dollar increment granted to classroom teachers who have obtained at least twenty years of teaching experience, pursuant to W.Va.Code § 18A–4–2.

Specifically, Dr. Capehart was seeking information as to whether or not school psychologists and social service and attendance workers are entitled to the annual supplement and if they are entitled to such supplement, are they entitled to back pay.

In response to this question, it is important to note that the W.Va.Code § 18A–4–2 only grants the supplement to "classroom teachers." The term "classroom teacher" is defined by W.Va.Code § 18A–1–1 as follows: "The professional educator who has direct instructional or counseling relationship with pupils, spending the majority of his time in this capacity". [sic]

Therefore, nothing in the law specifically requires that the supplement be paid to school psychologists or social service and attendance workers. In a letter dated February 6, 1990, our office stated that school counselors, school psychologist, social service *and attendance workers* and librarians were entitled to the supplement due to the fact that they work directly with the pupils, as required by W.Va.Code § 18A–1–1.

The letter of February 6, 1990, should be disregarded. It is now the position of our office that the only other employees who qualify for the supplement are librarians and school counselors. We therefore ask that the February 6, 1990, letter be disregarded. The school aid formula only allows for "classroom teachers" which includes librarians and school counselors. Any county who has been paying the supplement to school psychologists or social service *and attendance workers* has been doing so with county funds and not with state funds.

Hoping that I have been of service, I am
Sincerely,
Henry Marockie
State Superintendent of Schools
[Emphasis added.]

These letters do not weigh on behalf of the appellants' position. The first letter is not alleged to have been the basis for any reliance by the appellants. The second letter, generated in reply to a request by the Board for a current interpretation of the law as it should be applied to the appellants' case, is a reasonable reading of the statute and is consistent with our decision in *Andrews, infra*.

The second letter shows that while the state superintendent's current position is that attendance employees are not *entitled* to receive the statutory supplemental amount, the state superintendent also takes the position that county boards of education retain the *discretion* to set their attendance employees' salaries at a level that does include the six hundred dollar "classroom teacher" supplement. But if a county board does choose to give attendance workers the supplement, the superintendent's position is that such monies come from county funds only, and the state will not reimburse counties for the $600.00 supplement under the "school aid formula"—because the supplement is not a legal entitlement of the attendance employees.

5. *W.Va.Code*, 18–8–4 [1997] states, in pertinent part:

The county attendance director and the assistants shall diligently promote regular school attendance. They shall ascertain reasons for inexcusable absences from school of pupils of compulsory school age and students who remain enrolled beyond the sixteenth birthday as defined under this article and shall take such steps as are, in their discretion, best calculated to correct attitudes of parents and pupils which results in absences from school even though not clearly in violation of law.

In the case of five consecutive or ten total unexcused absences of a child during a school year, the attendance director or assistant shall serve written notice to the parent, guardian or custodian of such child that the attendance of such child at school is required and that within ten days of receipt of the notice the parent, guardian or custodian, accompanied by the child, shall report in person to the school the child attends for a conference with the principal or other designated representative of the school in order to discuss and correct the circumstances causing the inexcusable absences of the child; and if the parent, guardian or custodian does not comply with the provisions of this article, then the attendance director or assistant shall make complaint against the parent, guardian or custodian before a magistrate of the county.

\* \* \* \* \* \*

When any doubt exists as to the age of a child absent from school, the attendance director shall have authority to require a properly attested birth certificate or an affidavit from the parent, guardian or custodian of such child, stating age of the child. The county attendance director or assistant shall, in the

Our review of these duties does not disclose that they require attendance employees to primarily be involved in the direct instruction or counseling of pupils. Instead, the statutory duties of attendance employees appear to be primarily administrative in nature. *Cf. Pemberton,* note 3 *supra.*

The appellants presented brief, cursory and inconclusive testimony in the grievance proceedings, to the effect that their work includes an unspecified amount of one-on-one counseling with pupils regarding attendance issues. But by no stretch of the imagination could this minimal evidence be read to have established that the appellants' duties require them to "spend[ ] the majority of [their] time in ... [a] direct instructional or counseling relationship with pupils," which is the definitional test for the subcategory "classroom teacher." *W.Va.Code,* 18A–1–1(c)(1) [1997].

Based on the statute and the record, it is clear that the appellants' duties as attendance employees do not fit well within the "classroom teacher" subcategory. *Andrews* suggests that when we find such a poor fit, we should examine the alternatives. This examination reveals a subcategory, "central office administrator," the statutory definition of which reads, in pertinent part:

> other professional educators ... who are charged with the administering and supervising of the whole or some assigned part of the total program of the county-wide school system.

*W.Va.Code,* 18A–1–1–(c)(4) [1997].

The "central office administrator" definition fits the appellants' duties much better than the "classroom teacher" definition. The definition also echoes the analysis of the Tennessee court in *Pemberton (see* note 3 *supra )* describing an attendance employee position as an administrative position.

Based on the foregoing reasoning, we conclude that an attendance director or assistant employed by a county board of education pursuant to the provisions of *W.Va.Code,* 18–8–3 [1997] is not a "classroom teacher" who is entitled to receive the salary supplement provided for in *W.Va.Code,* 18A–4–2(b) [1998].

Thus, the ALJ's ruling that the appellants were not "classroom teachers" who are entitled to receive the classroom teacher salary

---

performance of his or her duties, have authority to take without warrant any child absent from school in violation of the provisions of this article and to place such child in the school in which such child is or should be enrolled.

The county attendance director shall devote such time as is required by section three of this article to the duties of attendance director in accordance with this section during the instructional term and at such other times as the duties of an attendance director are required. All attendance directors hired for more than two hundred days may be assigned other duties determined by the superintendent during the period in excess of two hundred days. The county attendance director shall be responsible under direction of the county superintendent for the efficient administration of school attendance in the county.

In addition to those duties directly relating to the administration of attendance, the county attendance director and assistant directors shall also perform the following duties:

(a) Assist in directing the taking of the school census to see that it is taken at the time and in the manner provided by law;

(b) Confer with principals and teachers on the comparison of school census and enrollment for the detection of possible nonenrollees;

(c) Cooperate with existing state and federal agencies charged with enforcement of child labor laws;

(d) Prepare a report for submission by the county superintendent to the state superintendent of schools on school attendance, at such times and in such detail as may be required; also, file with the county superintendent and county board of education at the close of each month a report showing activities of the school attendance office and the status of attendance in the county at the time;

(e) Promote attendance in the county by the compilation of data for schools and by furnishing suggestions and recommendations for publication through school bulletins and the press, or in such manner as the county superintendent may direct;

(f) Participate in school teachers' conferences with parents and students;

(g) Assist in such other ways as the county superintendent may direct for improving school attendance;

(h) Make home visits of students who have excessive unexcused absences, as provided above, or if requested by the chief administrator, principal or assistant principal.

(i) The attendance director shall serve as the liaison for homeless children and youth. (The 1997 amendments to this statute have not changed these duties in a way that affects the outcome of this case).

supplement was correct, and the circuit court was correct in upholding that ruling.

## B.

### *The Default Issue*

The appellants also contend that they should receive the classroom teacher salary supplement due to a default in the grievance proceedings by the Board.

To understand this issue, a more detailed recitation of the procedural history of the appellants' grievance is necessary.

In 1996, upon their request, the appellants were in fact given the $600.00 classroom teacher supplement by the Board's superintendent of schools, for the 1995–96 salary year only.[6] This was the first time that the classroom teacher supplement had been given to the appellants.

On September 20, 1996, the appellants filed the grievance that is at issue in the instant case, seeking retroactive payment of the supplement for their past years of employment as attendance employees. On September 24, 1996, the Board's associate superintendent asked the appellants if they would agree to a delay in processing their grievance, due to the superintendent's illness. The appellants would not waive the grievance timetable. On October 3, 1996, the grievance seeking retroactive pay was denied at Level I.

Before the October 3, 1996 Level I decision, on September 30, 1996, the interim superintendent sought advice from the state superintendent of schools as to whether the grievants were entitled to receive classroom teacher supplements. That advice was rendered in the December 5, 1996 letter from the State Superintendent, *see* note 4, *supra* —to the effect that the appellants were not entitled to the supplement.

Meanwhile, the appellants appealed to Level II, and a Level II hearing was held on October 9, 1996. The decision resulting from the Level II grievance hearing was not issued until November 4, 1996—approximately 1 month after the Level II hearing. The Level II grievance evaluator's decision, apparently based on the state superintendent's 1990 letter, reversed the Level I ruling, and awarded retroactive supplemental pay to the appellants. The state superintendent's December 5, 1996 letter had not yet been issued.

The appellants and the Board received a copy of the Level II decision on November 15, 1996. On November 21, 1996, the Board gave notice that it was requesting a Level IV hearing before an ALJ.

The appellants contended before the ALJ, *inter alia*, that the appellants had prevailed by default. at Level II as a result of an unexcused delay in the Board's Level II grievance response.

In addressing this contention, the ALJ ruled that the appellants' failure to raise the default issue prior to the Board's request for a Level IV hearing constituted a waiver of their default claim; and also that the fact that the Level II decision was favorable to the appellants made any default claim moot. The ALJ also looked to common-law principles disfavoring defaults—*see, e.g., Bego v. Bego,* 177 W.Va. 74, 78, 350 S.E.2d 701, 705 (1986) ("It is well accepted that courts look with disfavor on judgments obtained by default")—to find that the appellants should not prevail on a claim of default.

Having reviewed the facts regarding the appellants' grievance as they relate to the issue of default, we next turn to a discussion of the applicable law.

The grievance statute for school personnel that is applicable to the proceedings in the instant case is *W.Va.Code,* 18–29–3 [1992]. The specific statutory language regarding default as the result of the lack of a timely response by a grievance evaluator, at 18–29–3(a), states in pertinent part:

> If a grievance evaluator required to respond to a grievance at any level fails to make a required response in the time limits required in this article, unless prevented from doing so directly as a result of sickness or illness, the grievant shall prevail by default. *Within five days of such*

---

**6.** This was within the school board's discretion, but had to be paid only from county funds,

according to the state superintendent (*see* note 4 *supra* ).

*default,* the employer may request a hearing before a level four hearing examiner for the purpose of showing that the remedy received by the prevailing grievant is contrary to law or clearly wrong. In making a determination regarding the remedy, the hearing examiner shall presume the employee prevailed on the merits of the grievance and shall determine whether the remedy is contrary to law or clearly wrong in light of that presumption. If the examiner finds that the remedy is contrary to law, or clearly wrong, the examiner may modify the remedy to be granted so as to comply with the law and to make the grievant whole.

[Emphasis added.] *See also,* Syllabus Point 4, *Hanlon v. Logan County Bd. of Educ.,* 201 W.Va. 305, 496 S.E.2d 447 (1997) ("In order

to benefit from the 'relief by default' provisions contained in *W.Va.Code* § 18–29–3(a) (1992) (Repl.Vol.1994), a grieved employee or his/her representative must raise the 'relief by default' issue during the grievance proceedings as soon as the employee or his/her representative becomes aware of such default.")

We observed in *Martin v. Randolph County Bd. of Educ.,* 195 W.Va. 297, 465 S.E.2d 399, (1995) that the employer default provision in *W.Va.Code,* 18–29–3 [1992] is unusual, in that it appears that the default judgment factors applicable to civil actions that are "enunciated in Syllabus Point 3 of *Parsons v. Consolidated Gas Supply Corp.,* 163 W.Va. 464, 256 S.E.2d 758 (1979), do not apply" [7] to grievance procedures under *W.Va.Code,* 18–29–3 [1992]. 195 W.Va. at 305 n. 7, 465

---

7. Syllabus Point 3 of *Parsons* states:

In determining whether a default judgment should be entered in the face of a Rule 6(b) motion or vacated upon a Rule 60(b) motion, the trial court should consider: (1) The degree of prejudice suffered by the plaintiff from the delay in answering; (2) the presence of material issues of fact and meritorious defenses; (3) the significance of the interests at stake; and (4) the degree of intransigence on the part of the defaulting party.

Given the broad scope of *Parsons'* multifaceted inquiry, it is not difficult to understand why the Legislature in *W.Va.Code* 18–29–3 [1992] strictly limited the range of legitimate excuses for an employer's failure to make a timely grievance response.

If the full array of *Parsons* factors and related equitable principles disfavoring default were generally applicable to *W.Va.Code* 18–29–3 [1992], then nearly every defaulting employer would be able to assert grounds to avoid or nullify every "untimely response" default. The Legislature could legitimately conclude that such a practice would complicate all employer-default-related proceedings with a wide variety of distracting and ancillary disputes—about the lack of prejudice to an employee, the existence of meritorious defenses by the employer, mootness, etc. Such ancillary disputes would add new layers and levels to a proceeding that is designed to be expeditious and simple. *See* Syllabus Point 1, *Hale v. Mingo County Bd. of Educ.,* 199 W.Va. 387, 484 S.E.2d 640 (1997). Additionally, the employer default provisions of *W.Va.Code,* 18–29–3(a) [1992] are obviously designed to provide the powerful "stick" of a default, to pressure employers to promptly respond to grievances.

To judicially engraft the *Parsons* and related principles onto *W.Va.Code,* 18–29–3 [1992], as the ALJ in the instant case did, would add to and expand upon the statutory language in a di-

rection that substantially restricts employee rights and interests. This would contradict an important principle with respect to construing school personnel law—that if statutory construction is necessary and warranted, such construction should go in the direction of expanding or preserving employee protection, and not in the direction of limiting that protection. "School personnel regulations and laws are to be strictly construed *in favor of the employee.*" Syllabus Point 1, *Morgan v. Pizzino,* 163 W.Va. 454, 256 S.E.2d 592 (1979) (emphasis added).

In the instant case, the ALJ suggested that, despite this court's statement in *Martin* disavowing the general applicability of equitable factors to employer defaults in public employee grievance proceedings, those principles could nevertheless be applied in such proceedings on the issue of whether to set aside a default, as opposed to the issue of granting one.

This suggestion by the ALJ reflects an apparent misunderstanding of how defaults ordinarily occur. Defaults typically occur automatically or are obtained as ministerial acts, without any balancing of factors by a tribunal. The *Parsons* and related equitable factors, if they are applicable at all, almost always arise in a motion to set aside or nullify a default judgment.

Importantly, under the provisions of *W.Va. Code* 18–29–3(a) [1992]—as we have interpreted them in part III.B. of the instant opinion, by "filling in the blank" regarding when an employer must request a Level IV hearing regarding a default—employers will not be unfairly prejudiced by a default, even without the benefit of the full range of common-law equitable principles disfavoring default. If an employer, upon receipt of written notice of a claimed default, requests a hearing at Level IV within 5 days, the employer can still show at Level IV that the remedy received by the prevailing grievant is contrary to law or clearly wrong. *Id.*

S.E.2d at 407 n. 7. We also noted in *Martin* that "sickness or illness" by the employer's grievance evaluator are the only statutory grounds for excusing an untimely response by the grievance evaluator. *Id. See also* Syllabus Point 3, *Hanlon v. Logan County Bd. of Educ.*, 201 W.Va. 305, 496 S.E.2d 447 (1997) ("*W.Va.Code* § 18–29–3(a) (1992) (Repl.Vol.1994) makes mandatory the time periods within which grievances by educational employees must be filed, heard, and decided. If a grievance evaluator does not comply with the hearing and decision time periods, and his/her inaction does not come within one of the enumerated statutory exceptions, 'the grievant shall prevail by default.' W.Va.Code § 18–29–3(a) (1992) (Repl. Vol.1994).")

■ In the instant case, the Board was required to make a response (that is, to issue a decision) to the appellants' Level II grievance by October 14, 1996, or 5 days after the Level II grievance hearing. However, the Board's Level II grievance evaluator did not issue a response until November 4, 1996. There is no claim that this untimeliness was due to illness or sickness. Thus, applying the language of *W.Va.Code*, 18–29–3(a) [1992], regardless of the substantive ruling of the untimely Level II decision, the appellants were entitled to prevail by default at Level II, on the grounds of the Level II grievance evaluator's unexcused failure to make a timely response.

■ *W.Va.Code*, 18–29–3(a) [1992] provides that an employer (here the Board) is entitled to ask for a Level IV hearing regarding a default at any lower level "within five days of such default." [8] At such a hearing it is presumed that the grievant prevailed at the lower grievance level—and the employer may assert that the remedy received by the grievant as a result of prevailing by default is "contrary to law, or clearly wrong." *Id.*[9]

In the instant case, the Board did ask for a Level IV hearing—on November 21, 1996, after they received the (untimely) Level II decision. The appellants assert that this request by the Board for a Level IV hearing was also untimely. The appellants claim that the Board's default "occurred" on October 15, 1996—the date when the Level II decision became untimely.

The appellants argue that the Board was therefore required to have requested a Level IV hearing regarding the default within 5 days of October 15, 1996—or by October 20, 1996. Because the Board did not ask for a Level IV hearing in a timely manner, the appellants say that they are entitled to prevail on their claim for retroactive benefits.

In response to the appellants' arguments, the Board points out that it was unaware of the untimeliness of the grievance evaluator's response at Level II, and that no one brought the default claim to the Board's attention, so that the Board could exercise the right to ask for a Level IV hearing. The Board argues that in the absence of such a

8. At Level I, the grievance evaluator is the grievant's supervisor. At Level II, the grievance evaluator is the employer's chief administrator or their designee. At Level III, the evaluator is the governing board of the employer—Level III is waivable by the employer. Level IV is a hearing before a hearing examiner or ALJ. *W.Va.Code*, 18–29–4 [1995].

9. This standard for a Level IV review of a default resembles the deferential "contrary to law/clearly wrong" standard of review that courts commonly apply to the judgments of administrative bodies (and that this Court often applies to the judgments of circuit courts.) *See, e.g., Martin v. Randolph County Board of Education*, 195 W.Va. 297, 304, 465 S.E.2d 399, 406 [1995]. Such a standard is more commonly applied to decisions that are based on an administrative or trial court record. In the case of a default in the grievance process, there is less likely to be such a record

from the lower level grievance. From the statutory language, it appears that the legislative intent is, when an employee has prevailed by default as the result of an employer's unexcused failure to make a timely grievance response: (1) to create a presumption of correctness on the merits in favor of a grievant who has prevailed by default (especially as to matters of disputed fact involved in the grievance); (2) to conversely place a substantial burden upon an employer seeking to overturn or modify the result of a grievant's prevailing by default; and (3) to focus the Level IV review narrowly, applying this presumption and this burden, on matters directly relating to the legal correctness of the judgment or "remedy" obtained as a result of the grievant's prevailing by default in the grievance, and not to open the proceedings to ancillary issues. *See* note 7 *supra*.

notice of default to the Board, no default occurred.[10]

The differing positions of the appellants and the Board arise from the fact—not discussed by the parties in their briefs—that there is in fact a lacuna, or gap or void, in *W.Va.Code*, 18–29–3(a) [1992], the statutory provision that governs the employer default issue in the instant case.

The lacuna is the lack of a specified "triggering event" for the running of the 5 days during which an employer may ask for a Level IV hearing regarding a default based on the employer's failure to timely respond to a grievance.

Is the 5–day period triggered simply by the expiration of the grievance response time—as the appellants contend?

Or is the 5–day period triggered by some other event, such as the assertion of a default by the grievant—as the Board contends?

While the statute itself offers no clear guidance in answering these questions, they must be answered—both in order to decide this case, and so that parties to grievances arising under *W.Va.Code*, 18–29–3(a) [1992] will understand their rights and duties with respect to defaults.

In addressing these questions, we find that the Legislature, in a 1997 revision of another public employee grievance statute, *W.Va. Code*, 29–6A–3 [1997] (dealing with non-education employees), added a new subsection that also addresses the situation of defaults that occur due to the lack of a timely grievance response by an employer. Language from this revision, we find, can be helpful in addressing the issue that is posed by the lacuna in *W.Va.Code*, 18–29–3(a) [1992].

The "timely grievance response" employer default provisions of *W.Va.Code*, 29–6A–3 [1997] are quite similar, although not identical, to the provisions of *W.Va.Code*, 18–29–3(a) [1992].[11] Specifically, 29–6A–3 specifies and explains that the triggering event for the employer's 5–day period to request a Level IV hearing is "the receipt of a written notice of the default." *Id.* This provision is logical, and it protects the interests of both the employer and the employee.

The question then presents itself: should this Court apply the "5–day notice" language of *W.Va.Code*, 29–6A–3 [1997] to fill the lacuna in *W.Va.Code*, 18–29–3(a) [1992]?

Before answering this question, we pause to summarize our discussion thus far on the issue of default as it has arisen in the instant case.

First, we are uncertain regarding how to apply and construe *W.Va.Code*, 18–29–3(a) [1992], due to a lacuna in the statute's language regarding default-related procedures. Second, resolving the uncertainty will help decide the instant case and will give necessary guidance in future grievance proceedings. Third, the lacuna can be logically, fairly and consistently filled by looking to and

---

**10.** The Board also argues that the appellants' failure to raise the Level II default prior to the issuance of the Level II decision constituted a waiver of the default—or, alternatively, that the fact that the decision at Level II was favorable to the appellants mooted any claim of default. We do not base our decision on these issues, *see* notes 7 and 11 *infra.*

**11.** *W.Va.Code*, 29–6A–3(b) [1997] states in pertinent part:
The grievant prevails by default if a grievance evaluator required to respond to a grievance at any level fails to make a required response in the time limits required in this article, unless prevented from doing so directly as a result of sickness, injury, excusable neglect, unavoidable cause or fraud. *Within five days of the receipt of a written notice of the default,* the employer may request a hearing before a level four hearing examiner for the purpose of showing that the remedy received by the pre-

vailing grievant is contrary to law or clearly wrong. In making a determination regarding the remedy, the hearing examiner shall presume the employee prevailed on the merits of the grievance and shall determine whether the remedy is contrary to law or clearly wrong in light of that presumption. If the examiner finds that the remedy is contrary to law, or clearly wrong, the examiner may modify the remedy to be granted to comply with the law and to make the grievant whole.
[Emphasis added.]

Notably, the list of legitimate reasons to excuse an employer default is somewhat expanded in *W.Va.Code*, 29–6A–3(b) [1997], from the "sickness or injury" excuse in *W.Va.Code*, 18–29–3(a) [1992], to include "excusable neglect, unavoidable cause or fraud." However, the list of reasons is not expanded to include the full array of *Parsons* factors.

incorporating clarifying language in a similar and related statutory provision. Fourth, by such an incorporation, we can decide the instant case and avoid venturing into the highly questionable waters of applying general equitable principles disfavoring defaults to employer defaults in grievance proceedings.[12] Fifth, the result of the suggested incorporation does not contradict the remedial purposes of the statute, and no other more reasonable approaches suggest themselves.

■ Upon this reasoning, we hold that under *W.Va.Code*, 18-29-3(a) [1992] the 5-day period within which an employer may seek a Level IV hearing regarding a default in favor of a grievant based on the failure of a grievance evaluator to make a required response is triggered by the employer's receipt of a written notice of the default.[13]

Applying this principle to the facts of the instant case, the Board did not receive a written notice of the Board's Level II default prior to the Board's request for a Level IV hearing. Therefore, the Board's Level IV hearing request was timely.

The issue at Level IV was then whether the remedy received by the appellants at Level II was contrary to law or clearly wrong. That remedy—both as a result of the claimed default and as set out in the untimely Level II decision—was the determination that the appellants should be classified as "classroom teachers" for purposes of the salary supplement statute. And as we have already decided in part III.A., that determination was contrary to law.

Therefore, we uphold the ALJ's determination that the appellants were not entitled to be classified as "classroom teachers" for

salary supplement purposes as a result of an employer default.

## IV.

### Conclusion

For the foregoing reasons, the judgment of the Circuit Court of Fayette County is affirmed.

Affirmed.

Justices DAVIS, WORKMAN, and MAYNARD join in the Opinion of the Court.

McGRAW, Justice, dissenting.

(Filed July 21, 1999)

Even if I agreed with the majority's assessment that appellants failed to demonstrate that their work was primarily devoted to counseling students so as to put them under the rubric of "classroom teacher" as defined in W.Va.Code § 18A-1-1(c)(1)—which I do not—the absence of such proof in this isolated case does not form a sufficient factual basis upon which to broadly hold that *all* attendance personnel fall outside such designation, and should therefore be denied the salary supplement in question.

The majority recognizes that "the degree to which a professional educator directly works with students, regardless of the location of such work," is one of the primary criteria determining whether a school employee meets the definition of "classroom teacher." Majority op. at 130, 516 S.E.2d at 753 (citing *Putnam County Bd. of Educ. v. Andrews*, 198 W.Va. 403, 481 S.E.2d 498 (1996) (per curiam)).[1] I cannot see how,

---

12. We observe that we do not accept the ALJ's conclusion that the fact that the grievants prevailed on the merits of the Level II grievance mooted the issue of employer default—regardless of the timeliness of the Board's seeking Level IV review of the default. Independent of the substance of the untimely Level II grievance response, the Level II employer default was effective upon the expiration of the time for a response to the grievance—although subject to a Level IV hearing if requested by the Board within 5 days of a written notice of the default. If the Board had not sought review at Level IV within 5 days from the receipt of a written notice of default, the ALJ would have had no juris-

diction to review the remedy obtained by the grievants' prevailing by default at Level II.

13. This holding is consistent with our holding in Syllabus Point 4 of *Hanlon v. Logan County Bd. Educ.*, 201 W.Va. 305, 496 S.E.2d 447 (1997), requiring an employee to raise the relief by default issue as soon as the employee or employee representative becomes aware of the default.

1. *Andrews* was, of course, rendered *per curiam*. I note this otherwise unremarkable fact only because reliance upon such authority appears to conflict with this Court's recent admonitions that *per curiam* opinions are "not legal precedent,"

given this touchstone and the fact that attendance personnel are statutorily charged with duties that manifestly entail direct counseling of students, the Court can paint with such a broad brush.

Attendance directors and their assistants are charged by law with the fundamental duty of "ascertain[ing] reasons for inexcusable absences from school," and "tak[ing] such steps as are, in their discretion, best calculated to correct attitudes of parents and pupils which results in absences from school." W.Va.Code § 18–8–4 (1997). In accordance with this mandate, such personnel are also required to make home visits to students identified as having excessive unexcused absences, and are given the primary role in assisting homeless students. W.Va.Code § 18–8–4(h), (i). One simply cannot imagine

a more important "counseling" function than encouraging children to remain in school. I have no doubt that many of the people who are responsible for regulating attendance spend the majority of their time in direct contact with the most vulnerable and troubled of our youth. The State Superintendent of Schools clearly recognized this fact in his February 6, 1990 letter.

At the very least, this Court should refrain from concluding that no attendance personnel qualify as classroom teachers for purposes of receiving a salary supplement under W.Va.Code § 18A–4–2(b). As the majority tacitly recognizes, there is certainly nothing in Chapters 18 and 18A that expressly prohibits classifying these persons as classroom teachers. (I agree with the majority that attendance directors and their assistants are

---

*e.g., Elizabeth A.D. v. Hammack,* 201 W.Va. 158, 159 n. 1, 494 S.E.2d 925, 926 n. 1 (1997), and are "not to be cited as authority to this Court," *State ex rel. State v. Reed,* 204 W.Va. 520, 522 n. 4, 514 S.E.2d 171, 173 n. 4 (1999). Given the apparent confusion that these statements have caused among the bar and lower courts, *see* George Castelle, *Reversals, Per Curiams, and the Common Law,* W.Va. Lawyer, August 1998, at 26, as well as the fact that such a position raises serious constitutional concerns, I am compelled to take this opportunity to clarify my view regarding the significance of these opinions in the common law of our jurisdiction.

Although this Court at times, for whatever reasons, employs *per curiam* opinions to address issues of first impression, *see, e.g., Central West Virginia Reg'l Airport Auth. v. West Virginia Pub. Port Auth.,* 204 W.Va. 514, 513 S.E.2d 921 (1999), such opinions are customarily used only for disposition of cases involving issues that, at least upon initial review, turn exclusively upon well-settled principles of law. In light of the more cursory treatment afforded cases disposed of by *per curiam* opinion, they do not have the same precedential effect vis-à-vis the principle of *stare decisis* as do full-blown opinions authored by specific members of the Court. In other words, a *per curiam* opinion does not impose a significant impediment to the Court subsequently taking a different position on a particular issue. But, of course, this fact does not strip such opinions of all precedential value; rather, it simply means that in proceedings before this Court they are entitled to less weight than other fully-articulated opinions. This is the point that should be drawn from the Court's statement in *Lieving v. Hadley,* 188 W.Va. 197, 201 n. 4, 423 S.E.2d 600, 604 n. 4 (1992), that "[a] *per curiam* opinion that appears to deviate from generally accepted rules of law ... should be relied upon only with great caution."

That said, while *per curiam* opinions are not necessarily definitive statements regarding the law of this jurisdiction, they are nevertheless part of the common law, and are certainly binding upon all of the lower courts absent a conflict with other controlling authority, or until expressly modified or overruled by this Court. Article VIII, § 4, ¶ 2 of the West Virginia Constitution states:

No decision rendered by the court [of appeals] shall be considered as binding authority upon any court, except in the particular case decided, unless a majority of the justices of the court concur in such decision.

Implicit in this provision is the assumption that, where concurred in by at least three justices, the opinions of this Court are binding upon the lower courts. By mandating the reporting of any decision of this Court that reverses, modifies or affirms a judgment of an inferior court, *see* W.Va. Const. art. VIII, § 4, ¶ 3, the Constitution effectively incorporates all of our substantive rulings into West Virginia's common law. Any other conclusion would effectively negate one of the fundamental purposes of this provision: namely, to prevent the Court from deciding cases by caprice. Thus, the statement in *Lieving* to the effect that "[p]er curiam opinions ... are used to decide only the specific case before the Court; everything in a *per curiam* opinion beyond the syllabus point is merely *obiter dicta,*" 188 W.Va. at 201 n. 4, 423 S.E.2d at 604 n. 4, simply does not withstand constitutional scrutiny.

A case decided *per curiam* is, notwithstanding the limitations discussed above, as much a part of the common law of this jurisdiction as any other opinion rendered by this Court. Consequently, I simply fail to see any mischief in citing *per curiam* opinions as authority to this or any other court. Even where there is a conflict with other well-ensconced precedent, these cases are at the very least persuasive authority.

"school personnel" subject to Chapter 18A.) It is at least conceivable (if not highly probable) that many attendance directors and their assistants devote the majority of their work to counseling students.

Because I find that appellants sufficiently demonstrated that they are classroom teachers as defined by § 18A–1–1(c)(1), and, moreover, because there is no factual or legal basis upon which to conclude that all attendance personnel are precluded from falling under such classification, I respectfully dissent.