550 S.E.2d 51

**Angela S. LOVE, Plaintiff Below, Appellant,**

v.

**GEORGIA–PACIFIC CORPORATION, Defendant Below, Appellee.**

No. 28405.

Supreme Court of Appeals of West Virginia.

Submitted April 3, 2001.

Decided April 26, 2001.

Dissenting Opinion of Chief Justice McGraw July 6, 2001.

Ralph C. Young, Hamilton, Burgess, Young & Pollard, Fayetteville, for the Appellant.

Mark W. Browning, Shuman, McCuskey & Slicer, Charleston, A. Neal Barkus, Hunton & Williams, Washington, D.C., for the Appellee.

PER CURIAM.

Angela S. Love appeals from the September 3, 1999, order of the Circuit Court of Fayette County denying her motion for a new trial following the entry of an adverse judgment order on April 23, 1999, in a constructive retaliatory discharge action that Appellant brought against her former employer, Appellee Georgia–Pacific Corporation. Appellant also appeals from the trial

court's entry of judgment as a matter of law[1] on her claim of intentional infliction of emotional distress. Upon a thorough review of the entire record submitted to this Court, we find no error and accordingly, affirm.

## I. Standard of Review

The standard under which we review the trial court's refusal to grant a new trial is stated in *Tennant v. Marion Health Care Foundation*, 194 W.Va. 97, 459 S.E.2d 374 (1995): "We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard." *Id.* at 104, 459 S.E.2d at 381. Each of the assigned errors associated with the denial of the new trial motion are evidentiary rulings, which are similarly governed by an abuse of discretion standard of review.

"The West Virginia Rules of Evidence . . . allocate significant discretion to the trial court in making evidentiary . . . rulings. Thus, rulings on the admission of evidence . . . are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary . . . rulings of the circuit court under an abuse of discretion standard." Syl. Pt. 1, in part, *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995).

Syl. Pt. 9, *Tudor v. Charleston Area Med. Ctr., Inc.*, 203 W.Va. 111, 506 S.E.2d 554 (1997).

We review the lower court's granting of judgment as a matter of law to Appellee on the emotional distress claim under the same standard applied to directed verdicts:[2]

"The appellate standard of review for the granting of a motion for a directed verdict pursuant to Rule 50 of the West Virginia Rules of Civil Procedure is de novo. On appeal, this court, after considering the evidence in the light most favorable to the nonmovant party, will sustain the granting of a directed verdict when only one reasonable conclusion as to the verdict can be reached. But if reasonable minds could differ as to the importance and sufficiency of the evidence, a circuit court's ruling granting a directed verdict will be reversed." Syllabus Point 3, *Brannon v. Riffle*, 197 W.Va. 97, 475 S.E.2d 97 (1996).

Syl. Pt. 6, *McCloud v. Salt Rock Water Public Service*, 207 W.Va. 453, 533 S.E.2d 679 (2000).

## II. Factual and Procedural Background

Ms. Love began her employment with Georgia–Pacific in July 1994 when she was hired as a clerical assistant to work at its Mt. Hope plant. Within several months she was promoted to the position of Human Resources Assistant/Payroll Coordinator and in March 1996, Appellant was promoted to principal secretary to the Human Resources Manager, Denise Hughes. Sometime during March 1996, Georgia–Pacific terminated Appellant's husband, David Love, from its employ along with several other employees including the plant manager, Laurel Allen.[3]

On July 3, 1996, Appellant and her husband initiated a civil action in the Circuit Court of Wyoming County through which they asserted on behalf of themselves and all West Virginia employees of Georgia–Pacific that Appellee was violating the payment provisions of the West Virginia Wage and Pay-

---

1. *See* W. Va. R. Civ. P. 50(a).

2. We explained in *McCloud v. Salt Rock Water Public Service*, 207 W.Va. 453, 533 S.E.2d 679 (2000), that

 Rule 50 of the West Virginia Rules of Civil Procedure was amended in 1998, and the term "directed verdict" was replaced with the phrase "judgment as a matter of law." "The amendment did not, however, affect either the standard by which a trial court reviews motions under the rule or the standard by which an appellate court reviews a trial court's ruling."

 207 W.Va. at 457, n. 1, 533 S.E.2d at 683 n. 1 (quoting *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 482 n. 7, 457 S.E.2d 152, 159 n. 7 (1995)).

3. The issue of Mr. Love's termination is mentioned due to the fact that Appellant, when deposed, stated that her husband's firing was one of three possible reasons why Georgia–Pacific took the alleged retaliatory actions against her. Additionally, in responding to Appellant's intentional infliction of emotional distress claim at trial, Georgia–Pacific offered testimony to demonstrate that Ms. Love's emotional state was affected by her husband's termination.

ment Collection Act.[4] When Georgia–Pacific learned of Appellant's filing of the wage suit, a decision was made to move her out of the human resources department where she had access to the payroll records of all the non-exempt [5] plant employees as well as other confidential personnel file information.[6]

Initially, Ms. Love was moved to an unde-fined position [7] in the accounting department and had very few, if any, duties for the first week after the transfer. Over time, howev-er, she was given the responsibility for prep-aration of certain "down time" reports and entering data into a new database known as the preventive maintenance database. Ms. Love performed these duties under the su-pervision of Don Bundy, the Maintenance Superintendent, and in January 1997 she was given the newly-created position of preven-tive maintenance clerk. In mid-April 1997, Ms. Love was physically relocated to an of-fice that was in the maintenance area of the plant. Due to the physical location of her new office space, Ms. Love had to wear protective safety gear such as a hard-hat and hard-toed shoes or boots while she was walking in the production area of the plant on her way to the office.[8] On May 9, 1997, Appellant, with no notice, voluntarily relinquished her em-ployment.

Appellant filed the underlying lawsuit on August 22, 1997, in the Circuit Court of Fayette County, in which she alleged three causes of action against Georgia–Pacific: (1) retaliatory constructive discharge; (2) racial discrimination; and (3) intentional infliction of emotional distress. Ms. Love voluntarily dismissed her racial discrimination claim be-fore the trial court ruled on Appellee's mo-tion for summary judgment in January 1999.

The case proceeded to trial and was heard by a jury from March 24 through March 26, 1999. At the close of Appellant's evidence, the trial court granted Appellee's motion for judgment as a matter of law on Appellant's claim of intentional infliction of emotional distress. After concluding their delibera-tions, the jury returned its verdict, finding in favor of Georgia–Pacific on the only remain-ing claim—retaliatory constructive discharge.

Appellant filed a motion for a new trial, which was heard by the trial court on July 22, 1999, and denied, by order entered on September 3, 1999. As grounds for her new trial motion, Appellant argued that the trial court's evidentiary rulings limited her devel-opment of the factual basis for the wage suit; prevented her from demonstrating the preju-dices of Mr. Wayne Bales, a "super plant manager," with regard to whistle-blowers; and wrongfully injected the Appellant's race into the trial.[9] Through this appeal, Ms. Love seeks a reversal of the trial court's decision to deny her motion for a new trial and a reversal of the lower court's grant of judgment as a matter of law on the intention-al infliction of emotional distress claim.

### III. Discussion

Appellant argues that she was wrongfully denied from admitting certain items of physi-cal evidence which would have informed the jury "why she blew the whistle." Specifical-ly, Ms. Love complains that she should have been able to admit the Georgia–Pacific em-ployee handbook; a wage poster; [10] and a memorandum dated May 9, 1997, informing Georgia–Pacific employees that wages would

**4.** *See* W.Va.Code §§ 21–5–1 to –18 (1979) (Repl. Vol.1996).

**5.** These were the non-salaried employees who were permitted to earn overtime.

**6.** Georgia–Pacific employees testified at trial that the motivation underlying this job transfer was the conflict presented by the fact that Ms. Love would be the individual to whom discovery re-quests would be referred in connection with the wage payment law suit and also because she would have continued access to confidential per-sonnel and payment information that might be relevant to her wage lawsuit.

**7.** Her salary was not reduced.

**8.** She also had to don this equipment when she went to the bathroom or any other time that she walked through the production areas of the plant.

**9.** Appellant is the child of an African–American father and a Caucasian mother.

**10.** The poster, which is required to be posted in a prominent place, states the requirements for compliance with the Wage Payment and Collec-tion Act. *See* W.Va.Code § 21–5–9.

now be paid every two weeks.[11] With regard to each of these three pieces of evidence, the trial court ruled that they were not relevant to the allegations of Appellant's retaliatory constructive discharge suit. The trial court did permit testimony to be fully adduced as to Appellant's filing of a wage suit and the basis for the lawsuit: noncompliance with West Virginia wage payment laws. Beyond that fact, the trial court determined that there was no need to have a trial within a trial and that proof of the merits of the wage suit had no relevance to the instant case.

### A. Constructive Discharge Law

■■■ Before proceeding to address the specific evidentiary rulings at issue, we find it helpful to review the elements of proof necessary for Appellant to succeed on her claim of retaliatory constructive discharge claim. In *Slack v. Kanawha County Housing and Redevelopment Authority,* 188 W.Va. 144, 423 S.E.2d 547 (1992), we held that:

> A constructive discharge cause of action arises when the employee claims that because of age, race, sexual, or other unlawful discrimination, the employer has created a hostile working climate which was so intolerable that the employee was forced to leave his or her employment.
>
> Where a constructive discharge is claimed by an employee in a retaliatory discharge case, the employee must prove sufficient facts to establish the retaliatory discharge. In addition, the employee must prove that the intolerable conditions that caused the employee to quit were created by the employer and were related to those facts that gave rise to the retaliatory discharge.
>
> In order to prove a constructive discharge, a plaintiff must establish that working conditions created by or known to the employer were so intolerable that a

reasonable person would be compelled to quit. It is not necessary, however, that a plaintiff prove that the employer's actions were taken with a specific intent to cause the plaintiff to quit.

*Id.* at 145–46, 423 S.E.2d at 548–49, syl. pts. 4, 5, and 6.

It is axiomatic that the introduction of evidence at trial is governed by the relevancy of that evidence to the issues before the court. *See* W. Va. R. Evid. 401. Since Georgia–Pacific stipulated that the filing of a wage suit is a protected act [12] which may not be the basis for retaliatory action, Appellant was not required to prove the existence of a protected act. *Cf. Tudor,* 203 W.Va. at 122–25, 506 S.E.2d at 565–68 (1997) (permitting introduction of evidence regarding hospital staffing practices for purpose of proving existence of protected act). Instead, the only issues to be decided at trial with regard to the retaliatory constructive discharge claim were: (1) whether the actions taken by Georgia–Pacific in moving Appellant from one position to another were performed in retaliation for the filing of the wage suit; and (2) whether those employment actions created a hostile working environment that was so intolerable that a reasonable person would feel compelled to resign.

### B. Wage Payment Suit Evidence

When presented with the issue of admitting both the employee handbook and the wage poster into evidence, the trial court opined:

> I think [Georgia–Pacific's] counsel and I have let you say that there was a sign on there that addressed pay issues [wage poster].
>
> I think that it can come into evidence that this woman realized that the sign wasn't being complied with and instituted a suit. Other than that, getting into the handbook and what she wants to is exactly

---

11. Previously, employees could chose to be paid on a monthly basis or to get 40% of their pay, with no taxes deducted on the 15th of the month, and the remainder at the end of the month. Under our wage payment laws, employees subject to the Wage and Payment Collection Act must be paid at least once every two weeks absent the existence of a special agreement. *See* W.Va.Code § 21–5–3.

12. The threshold issue in any wrongful discharge case is whether the plaintiff engaged in an act that is protected by a substantial public policy. *See Kanagy v. Fiesta Salons, Inc.,* 208 W.Va. 526, 529, 541 S.E.2d 616, 619 (2000); *Lilly v. Overnight Trans. Co.,* 188 W.Va. 538, 540, 425 S.E.2d 214, 216 (1992).

what I told you I don't think is required under Tudor.

... I've looked at other cases that leads me to believe we don't have to try this wage suit, and that's the reason I said that I don't think the proper foundation has been laid to get in this type evidence.

I think there's some questions you can ask just to show what kind of suit she brought and why she brought it. If counsel wants to contest it and say she didn't have the right to do it and we get in this issue, you can bring it in.

But if, as counsel has indicated, they acknowledge it, or don't take issue with it, it's not relevant to this case.

Based on similar concerns of relevancy, the trial court denied Appellant's motion to admit a memorandum dated May 9, 1997, announcing Georgia–Pacific's change in its pay policy.[13]

While Appellant vigorously argues that the jury was deprived of the necessary evidence from which it could have gleaned why she filed the wage suit, the record proves otherwise. On direct examination, Ms. Love testified "Yes" in response to counsel's question asking whether in July 1996 she filed "a lawsuit naming Georgia–Pacific as a defendant, seeking to compel Georgia–Pacific to comply with West Virginia State Wage Law?" The jury was fully apprised through Appellant's cross examination testimony that Ms. Love's wage suit had far-reaching implications for Georgia–Pacific because the relief Appellant and her husband sought was for *all* West Virginia Georgia–Pacific employees: [14]

Q. And then the wage payment lawsuit was filed on your behalf in July of 1996?
A. Yes.
Q. Both you and your husband were plaintiffs in the case?
A. Yes.

Q. And you were trying to represent in that case all the nonexempt Georgia–Pacific employees at the Mt. Hope plant and also in other places in West Virginia?
A. That's right.

The jury heard evidence through the testimony of Appellant, Mr. Wolfe,[15] and Ms. Hughes regarding the inclusion in the Georgia–Pacific handbook of two payment options from which employees selected whether they wished to be paid once or twice a month. Consistent with the trial court's initial ruling to permit evidence regarding what type of suit Appellant filed and the reasons for the filing of the suit, testimonial evidence was admitted regarding the pay practices of Georgia–Pacific, the wage suit, and the existence of a poster stating how wages are to be paid under West Virginia law. In denying the admission of the employee handbook and the wage poster as physical evidence, the trial court determined that these items, while relevant to the wage suit, were not relevant to the issue of retaliatory constructive discharge. The jury was not denied, however, from hearing both evidence and argument regarding any of these matters. Contrary to her representations, the record reveals that Appellant was not denied the opportunity to explain to the jury why she "blew the whistle."

■ Upon our review of the record, we find no error in the lower court's ruling denying admission of the employment handbook; the wage poster; or the May 9, 1997, memorandum. The introduction of this physical evidence was clearly outside the scope of the issues before the trial court.

## C. Wage Suit Evidence as Rebuttal

Appellant argues that she should have been permitted to admit rebuttal evidence relevant to the underlying wage payment suit

---

**13.** When Appellant went to collect her belongings on the day she voluntarily terminated her employment, there was a memorandum on her desk stating that Georgia–Pacific would be altering its method of pay and that employees would now be paid every fourteen days.

**14.** On appeal, Appellant suggested that the jury was not aware that the relief sought through the

wage suit involved more individuals than Appellant and her husband. The wage suit is reportedly still pending, and apparently was never actively pursued.

**15.** Mr. Wolfe is the Divisional Human Resources Manager for Georgia–Pacific.

based on the evidence offered by Georgia–Pacific to explain its actions toward Ms. Love. By testifying that concerns about confidentiality prompted it to remove Ms. Love from her position as the human resources secretary, Appellant contends that Georgia–Pacific "opened the door" to permit her to challenge this explanation with evidence regarding the wage suit.[16] When Appellant renewed her motion to admit the physical evidence of the employee handbook and the wage poster, arguing that Georgia–Pacific "opened the door for it by trying to establish that the reason for the removal of Ms. Love from her Human Relations position was confidentiality[,]" the Court denied the motion, stating that "those are items that have been testified about [and] I don't know that the introduction of that evidence would do anything to aid this jury and, therefore, my ruling is the same." Appellant's counsel then moved to admit the May 9, 1997, memorandum and the trial court ruled: "The Court is of the opinion that the [wage payment] policy, whatever it was, is not an issue in this case and to introduce that memorandum, notice, whatever it is, is not permissible."

██ While a plaintiff in a retaliatory constructive discharge case, like any other type of employment discrimination, is permitted to show that the reasons offered for an employer's actions were a "pretext" for the alleged discriminatory conduct, to be admissible the evidence offered to prove pretext must nonetheless be relevant. *See Powell v. Wyoming Cablevision, Inc.*, 184 W.Va. 700, 705, 403 S.E.2d 717, 722 (1991); W. Va. R. Evid. 402. In refusing to admit the employee handbook, the wage poster, and the May 9, 1997, memorandum, the trial court determined that this evidence was not relevant to the issue of whether Georgia–Pacific had retaliated against Ms. Love for her filing of the wage suit.

Appellant's contention that she was denied the opportunity to prove her theory that the reasons offered by Georgia–Pacific for its action were pretextual is not borne out by the record. In fact, just the opposite is true. Through the testimony of Ms. Love and employees of Georgia–Pacific,[17] Appellant advanced her theory that the confidentiality explanation was pretextual. The following excerpt from Appellant's cross-examination of Mr. Wolfe proves this point:

Q: So the issue of that lawsuit was challenging the Plan A or the Plan B, because each employee got paid either one way or the other. It was up to them; right?

A. Yes, sir.

Q. And that wasn't a secret, was it?

A. No, sir.

Q. Then there is no confidentiality issue, is there? That's really a pretext or a pretend reason for moving her.

A. No. I disagree with that.

Georgia–Pacific contends, and the record supports this contention, that Appellant "vigorously argued to the jury that Georgia–Pacific's pay practices were not a secret." Through both evidence and argument, Appellant did in fact put forth her theory that the confidentiality concern given by Georgia–Pacific for its actions in moving Ms. Love out of the Human Resources department was not a credible explanation. For whatever reason, the jury simply chose not to accept Appellant's theory of the case. Our examination of the record compels the conclusion that Appellant was not denied the opportunity to develop her theory of pretext and that the wage payment evidence which was excluded was simply not relevant to the issue of constructive retaliatory discharge.

### D. Excluded Testimony

██ Appellant argues that the trial court prevented it from introducing " 'smoking gun' evidence of the plant superintendent's stated intent to retaliate against anyone with the audacity to blow the whistle on any wrongdoing." Appellant sought to introduce testimony through a former Georgia–Pacific

---

16. We note, however, that when asked during oral argument to identify what additional evidence that Appellant would have introduced if permitted, counsel did not specify any new evidence.

17. Both Mr. Wolfe and Ms. Hughes were questioned about the "confidentiality" of the payment practices of Georgia–Pacific.

employee, Judy Buice,[18] regarding an alleged encounter that she had with Wayne Bales, a so-called "super plant manager." [19] Out of the presence of the jury, Ms. Buice was permitted to vouch the record with her testimony regarding this encounter. According to Ms. Buice, she was told that she would not be considered for a transfer to another plant based on the fact that she had previously "revealed and uncovered a federal offense" at another Georgia–Pacific plant. After being presented with Ms. Buice's proposed testimony, the trial court ruled that such testimony was "not relevant to the proceedings here at hand" and that it "has to do directly with her [Ms. Buice's] situation."

In response to Appellant's argument that Ms. Buice's proffered testimony "demonstrated the plant superintendent's predilection to retaliate against whistle-blowers," Georgia–Pacific notes that Mr. Bales was neither the plant superintendent[20] nor was he a direct supervisor with regard to Ms. Love. Appellee further argues that it is the knowledge and conduct of the decision maker that is relevant to proof of the causal element in retaliatory employment cases. *See Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir.1998) (finding that decision maker must be aware of the protected conduct); *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir.1998) (stating that perception of decision maker, and not of co-workers, is relevant to issue of retaliation); *accord Cuevas v. Monroe Street City Club, Inc.*, 752 F.Supp. 1405, 1412 (N.D.Ill.1990) (observing that "only evidence probative of the actual decisionmaker's motives is relevant") (quoting *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1412 (7th Cir.1984)). According to the testi-

mony presented in this case, the decision to move Ms. Love out of the human relations position was made by Mr. Wolfe, a Divisional Human Resources Manager for Georgia–Pacific along with Mr. Paul, a Georgia–Pacific Vice–President, and Gloria Cheatham, in-house legal counsel. Mr. Bales testified that he made a recommendation as to moving Ms. Love out of the human resources position, but that he did not participate in the actual decision to make the transfer.

We find it unnecessary to further analyze whether Mr. Bales' participation in recommending that Ms. Love be transferred out of the human relations position placed him within the ambit of decision maker as the alleged conversation between Mr. Bales and Ms. Buice had no relevance with regard to whether the acts Appellant complained of were tied to her filing of the wage suit. Accordingly, we find no basis for concluding that the trial court abused its discretion in ruling that the vouched testimony of Ms. Buice was not relevant to the issue before the court.

### E. Wrongful Injection of Race

■ Appellant claims that Georgia–Pacific wrongfully injected the issue of her race into the trial and thereby prejudiced her case. Our review of the record reveals that there were only two references to race[21] and that Appellant's inconsistent trial testimony permitted the limited impeachment testimony that was adduced on this issue. Moreover, Appellant and her counsel, due to the advance ruling sought by Georgia–Pacific on this issue, had the opportunity to prevent Georgia–Pacific from bringing up the issue of race up at trial.[22]

Before questioning Ms. Love about what conduct of hers led to Georgia–Pacific's decision to transfer her from her human re-

---

18. Ms. Buice was the shipping department supervisor at the Mt. Hope plant and a close friend of Ms. Love.

19. Mr. Bales had supervisory duties over both the Mt. Hope plant and another Georgia–Pacific plant in Brock Neal, Virginia.

20. For a period of about a month and a half, Mr. Bales was the acting plant manager at the Mt. Hope plant between the firing of Laurel Allen in February 1996 and the hiring of Tim Adams in April 1996.

21. *See supra* note 9.

22. Had Ms. Love testified at trial consistent with her deposition testimony that there were three possible motivations underlying Georgia–Pacific's actions, she could not have been impeached. We are aware that Appellant would have nonetheless placed the issue of race before the jury, but this result would have obtained from the manner in which she brought the complaint and her own testimony and not through any fault of the Appellee.

**524**

sources position, counsel for Georgia–Pacific sought a ruling from the trial court regarding whether it would be permitted to impeach Ms. Love's testimony with her deposition testimony if she testified that the only basis for the move was her filing of the wage suit. After hearing argument on this issue, the court ruled:

> [W]hat [Georgia–Pacific's] counsel wants to do is ask this witness if her reason for the manner in which ... [it] acted was because of the suit and only the suit. . . .
>
> If she says there's other reasons, then I think you're entitled to ask her what they are. We're not getting into her racial background. We're not going to get into this and that. But I think you're entitled to ask the questions that you have posed to the Court because, as I understand it, if she says the suit was it, you've got a prior inconsistent statement that came up at a deposition that shows that there were other reasons and these reasons are this, this and this, and then it stops.

Counsel for Georgia–Pacific carefully complied with the trial court's directive by limiting its impeachment of Appellant's inconsistent trial testimony to a mere recitation of one question posed to her during her deposition and her answer.[23] No further use was made of the prior inconsistent statement and the only other reference to race was made in Appellee's closing argument when counsel argued to the jury that Appellant was not "even certain what the reasons were" for Georgia–Pacific's actions and then stated: "Could have been her husband's termination. Could have been the lawsuit. Could have been race." These statements were clearly permitted given the proper impeachment of Appellant at trial with her deposition testimony.

When asked to limit the use of Appellant's deposition testimony as impeachment based on the wrongful injection of racial heritage,

the trial court clarified that the issue of Appellant's racial background was not before the jury.

> There's no evidence before this jury about a mixed race. I don't think it's been brought up. The Court didn't make its ruling based upon the statement you made to the Court because there hadn't been anything about mixed race.
>
> I made the ruling based upon that there had been prior inconsistent statement that counsel indicated to me there's reasons other than this lawsuit for why the woman was treated like she was, or possibly could be, and that's the statement that can come in.

Our review of the record reveals that the trial court properly limited the manner in which the prior inconsistent statement was used and that Appellant's mixed heritage was not gratuitously injected into the trial by Georgia–Pacific.

### F. Emotional Distress Claim

 The only non-evidentiary assignment of error Appellant raises is the trial court's granting of judgment as a matter of law on the intentional infliction of emotional distress claim. In syllabus point three of *Travis v. Alcon Laboratories, Inc.*, 202 W.Va. 369, 504 S.E.2d 419 (1998), we set forth the following elements for this type of claim:

> In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer

---

23. The record reflects the full extent of the impeachment:

Q. All right, Mrs. Love, we were discussing your deposition, and I was prepared to read you a statement—a question that was asked you ... and your answer that followed it.

Question: "Do you attribute any of these differences that you have described in your

working conditions, the coffee room and Nancy locking her office, to retaliation against you?"

Answer: "Yes. But I don't know if it was due to the lawsuit, due to my husband's being fired, or due to my race." Do you recall that testimony?

A. Yes, I do.

emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

We further instructed in that case that

In evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim, the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination.

*Id.* at 371, 504 S.E.2d at 421, syl. pt. 4.

The evidence offered by Appellant regarding the emotional stress that she suffered as a result of the retaliatory conduct of her former employer was minimal. Her treating physician, Dr. Thomas, testified that the symptoms with which Appellant presented to him "were not the symptoms of severe emotional distress" and that he prescribed for her "the lowest dose ... [he] could use" of an antidepressant. When questioned as to the dosage amount of the antidepressant, e.g. one tablet per day, Appellant was unable to recall the amount of medication she had taken. Ms. Buice, the co-worker[24] and friend of Ms. Love, testified that Appellant never told her that she thought the company was mistreating her because of the lawsuit and further that Ms. Love had never complained to her that her job duties were oppressive or outrageous.

In determining whether the conduct of Georgia–Pacific could be regarded as so extreme and outrageous as to constitute intentional infliction of emotional distress as a matter of law, the trial court reviewed the evidence presented on direct. That evidence included an on site inspection of the various office areas in which Appellant worked before and after the filing of her wage suit; Appellant's testimony regarding her job duties after she was moved from the human relations department; Appellant's testimony

that she was not advised in advance of a pizza lunch and embarrassed when she brought a bag lunch; Appellant's testimony that other office workers would not associate with her; and Appellant's testimony regarding the safety equipment she had to wear at her final location in the plant. In weighing this testimony, the trial court also had before it evidence of the following facts: that Appellant continued to receive salary increases in her new positions as well as good performance reviews; that Appellant was eligible and did receive a bonus through the production bonus gainsharing program; that Appellant received praise for her community service work performed on behalf of the plant; that Appellant was very emotional at work after her husband was fired by Georgia–Pacific; and that Appellant sought employment from the Fayette County Board of Education after the firing of her husband but before the filing of the wage suit.

After weighing the evidence offered relative to this claim, the trial court concluded, as a matter of law, that Appellant had failed to meet her burden of demonstrating that Georgia–Pacific's conduct was so extreme and outrageous as to constitute intentional infliction of emotional distress. While we do not doubt that Appellant may have endured a certain amount of emotional discomfort due to her job transfer, the evidence presented at trial was not sufficient to be presented to the jury under the standards set forth in *Travis*. *See* Syl. Pt. 4, 202 W.Va. at 371, 504 S.E.2d at 421. In discussing the reaches of an intentional infliction of emotional distress claim, this Court observed in *Tanner v. Rite Aid*, 194 W.Va. 643, 461 S.E.2d 149 (1995), that this claim "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" and that "[t]here is no occasion for the law to intervene in every case where some one's feelings are hurt." *Id.* at 651, 461 S.E.2d at 157 (quoting *Restatement (Second) of Torts* § 46(1)).

Based on the foregoing, the decision of the Circuit Court of Fayette County in denying Appellant's motion for a new trial is affirmed and the decision to grant judgment as a

---

**24.** At the time of trial Ms. Buice no longer worked for Georgia–Pacific.

**526**

matter of law on Appellant's intentional infliction of emotional distress claim is also affirmed.

Affirmed.

McGRAW, Chief Justice, dissenting.

(Filed July 6, 2001)

In this case the plaintiff below went from working for the plant manager for human relations to working as an "errand-girl" in the production area of the plant in less than a year. This coincidental demoting of the plaintiff coincided with her filing of a wage-payment suit against Georgia–Pacific.

She wished to enter into evidence several items that would explain why she filed the wage suit. Chief among these was a memorandum that showed that Georgia–Pacific found it necessary to change its payment policies so that all employees would be paid every two weeks, as our law requires.

The judge kept this evidence out of the trial. I believe a jury should have had access to this evidence, so that they could better understand the case. Essentially, Ms. Love sought to introduce this evidence to show Georgia–Pacific's motive for demoting her.

Had the jury had evidence before it that showed that Ms. Love's· actions forced this company to change its ways, it is possible that the jury would then have felt that Georgia–Pacific had sufficient motive to retaliate against Ms. Love. It is not ours to say whether the company in fact retaliated against Ms. Love for her wage suit by constructively discharging her. However, I see no valid reason to have kept this evidence from the jury, and on that basis, I would have granted Ms. Love's request for a new trial.

Therefore, I respectfully dissent.