541 S.E.2d 616

**Donna KANAGY and Tim Kanagy, Plaintiffs Below**

v.

**FIESTA SALONS, INC., and Myrna Disbennett, in her individual capacity, Defendants Below.**

No. 27775.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 4, 2000.

Decided Nov. 14, 2000.

Dissenting Opinion of Chief Justice Maynard Dec. 5, 2000.

Jerry A. Wright, Keenan & Associates, Fayetteville, for Plaintiffs.

Forrest H. Roles, Heenan, Althan & Roles, Charleston, D. Lewis Clark, Jr. (Pro Hac Vice), Squire, Sanders & Dempsey, Columbus, OH, for Defendants.

SCOTT, Justice.

This matter is before the Court on a certified question from the United States District Court for the Southern District of West Virginia, Beckley Division. The certified question has been posed as follows:

> Is there a substantial public policy in the State of West Virginia, embodied in West Virginia Code § 30–1–5(b) and § 30–27–1 et seq. and the regulations established thereunder, express or implied, which would support a claim for wrongful discharge where an employee is allegedly discharged for providing truthful information to an Investigator for the Board of Barbers and Cosmetologists, thereby indicating that the employer violated the Board's rules?

Having reviewed the facts of this case and the relevant pronouncements of the legislature, the Code of State Regulations, the West Virginia Board of Barbers and Cosmetologists (hereinafter "Board"), and this Court on the issues in controversy, we answer the certified question in the affirmative.

## I. Facts

Mrs. Donna Kanagy (hereinafter "Plaintiff" or "Mrs. Kanagy") was employed by Defendant Fiesta Salons, Inc., (hereinafter "Fiesta") from May 19, 1997, through January 21, 1998, as manager of the Fiesta Hair and Tanning Salon in Oak Hill, West Virginia. Mrs. Kanagy's direct supervisor, Defendant Mrs. Myrna Disbennett, was headquartered in Fiesta's home office in Columbus, Ohio, and was not licensed to practice cosmetology in West Virginia.

In January 1998, an investigator for the Board approached Mrs. Kanagy and questioned her concerning Mrs. Disbennett's practice of cosmetology in West Virginia. Mrs. Kanagy confirmed that Mrs. Disbennett did occasionally do styling work on customers during her visits to the Oak Hill salon. Mrs. Kanagy alleges that Mrs. Disbennett learned of the conversation with the investigator and confronted Mrs. Kanagy in an angry manner, berating her for providing information to the investigator. Mrs. Kanagy also alleges that Mrs. Disbennett stated that cosmetologists should protect and vouch for one another and directed Mrs. Kanagy to refrain from providing information concerning Mrs. Disbennett's activities.

Mrs. Disbennett subsequently received a strongly worded letter from the Board advising her that her unlicensed practice of cosmetology in West Virginia was in violation of state law. The Board directed Mrs. Disbennett to cease performing the work and threatened her with a fine of up to $1000.00 per day.

According to Mrs. Kanagy, she received a telephone call from Mrs. Disbennett on January 17, 1998, ostensibly to commend her on the Oak Hill salon's financial success. Mrs. Kanagy contends that Mrs. Disbennett directed her to remove $30.00 from the salon's petty cash fund to order pizza for herself and the salon staff. Mrs. Kanagy subsequently

determined that $20.00 was sufficient to purchase the pizza and removed that amount from the petty cash drawer. As required by company policy, Mrs. Kanagy noted the withdrawal on a financial log. Mrs. Kanagy alleges that the $20.00 was placed in a locked desk drawer and explains that she planned to purchase the pizza for the staff at a later date.[1]

On January 21, 1998, Mrs. Disbennett entered the Oak Hill salon and dismissed Mrs. Kanagy from employment, alleging that Mrs. Kanagy had stolen $20.00 from the cash drawer. Although Mrs. Kanagy showed Mrs. Disbennett the $20.00 in the locked drawer, Mrs. Disbennett continued to maintain that the $20.00 had been stolen by Mrs. Kanagy. In June 1999, Mrs. Kanagy and her husband Tim Kanagy filed a wrongful discharge action in the Circuit Court of Fayette County, alleging in Count Two of the Complaint that Mrs. Kanagy's dismissal was "wholly or substantially motivated by the information she provided the Investigator" and Mrs. Disbennett's desire to retaliate against Mrs. Kanagy in violation of West Virginia Code §§ 6C–1–1 to –8 (2000).[2] The Defendants removed the action to federal court and moved to dismiss Count Two of the

Complaint based upon the contention that the Plaintiffs' public policy claim was not viable as a matter of law. The Plaintiffs opposed the motion to dismiss, arguing that substantial public policy exists in the regulations governing the Board, authorized by West Virginia Code §§ 30–27–1 to –16 (1998),[3] specifically West Virginia Code of State Regulations § 3–5–3–1, which provides:

> Duty to Carry Out Rules, Reporting and Complaints. It shall be the duty of the proprietors of all barber or beauty shops, barber or beauty schools, and all licensed barbers, cosmetologists, students, and others to assist in carrying out the provisions of this rule by reporting any violation to the Board or any of its duly authorized agents.

The Plaintiffs maintain that the cited rules provide the basis for a finding that the dismissal of an at-will employee for providing truthful responses to the Board regarding her employer's violations of licensure requirements contravenes a substantial public policy and that the employee is afforded a common law action for wrongful discharge.

Conversely, the Defendants contend that the cosmetology regulations do not create a substantial public policy sufficient to support

---

1. Because this matter is before the Court in the posture of a certified question, we do not have the benefit of any evidence accumulated during a discovery process. The certified question requires us to resolve only the legal issue of whether a cause of action exists; we are therefore not impeded by the absence of complete factual development.

2. The Plaintiffs now concede that their original allegation of a violation of the Whistle–Blower Statute of West Virginia Code § 6C–1–1 was in error because the statute is only applicable to employees of the State of West Virginia. Thus, the Plaintiffs' counsel filed a motion to amend the Complaint, admitting the error and altering the allegation, as follows:

> Plaintiff Donna Kanagy's dismissal was wholly or substantially motivated by the information she provided the Investigator for the West Virginia Board of Barbers and Cosmetologists, and the Defendants' desire to retaliate against her for doing so. The retaliation was in contravention of public policy and a violation of state law which prohibits reprisal against an employee who provides true and accurate information concerning his or her employer's violation of the rules of a state regulatory agency.

3. West Virginia Code §§ 30–27–1 to –16 provide for the establishment of a Board of Barbers and Cosmetologists and provide authority for the promulgation of rules and regulations governing the practice of that profession. West Virginia Code of State Regulations § 3–1–3 provides that "[i]t is unlawful for any person to practice or offer to practice barbering, beauty culture, manicuring, or aesthetics in this state without first obtaining a license for that purpose from the Board." Section 3–1–3.2 provides:

> Every person practicing barbering, beauty culture, manicuring or aesthetics and every student shall display his or her license or license renewal in a conspicuous place in the shop where he or she practices or is employed and whenever required, shall exhibit the license to the board or its authorized representative.

Section 3–7–2.12 permits the Board to impose financial sanctions of $500.00 for the first offense and $1,000.00 for the second offense, for permitting unlicensed persons to practice cosmetology. W. Va.C.S.R. 3–7–2.12. Section 3–5–2.21 requires the license to be "framed and posted near each barber and beauty chair or work stand." W. Va.C.S.R. § 3–5–2.21.

a claim for wrongful discharge where an employee is allegedly discharged for providing truthful information to an investigator. The Defendants emphasize that the cosmetology laws do not contain a specific provision prohibiting such reprisal. The Defendants extend that argument to the conclusion that "because the statutes and regulations do not even address Defendant's alleged conduct, they cannot provide the basis for a public policy claim."

## II. Discussion

■ At common law, an at-will employee serves at the will and pleasure of his or her employer and can be discharged at any time, with or without cause. *Wright v. Standard Ultramarine and Color Co.*. 141 W.Va. 368, 382, 90 S.E.2d 459, 468 (1955). In *Harless v. First National Bank*, 162 W.Va. 116, 246 S.E.2d 270 (1978), however, we acknowledged the expanding inclination toward an exception to the common law at-will employment doctrine.[4] We recognized that despite the fact that an employer normally has the right to discharge an at-will employee without cause, a discharge may be considered wrongful when the discharge is motivated by the employer's desire to contravene some substantial public policy. In the syllabus of *Harless*, this Court stated:

> The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy princip[le], then the employer may be liable to the employee for damages occasioned by this discharge.

■ Since our initial pronouncements in *Harless*, we have been required to determine what constitutes a sufficiently clear embodiment of public policy in several different contexts. In *Cordle v. General Hugh Mercer Corp.*, 174 W.Va. 321, 325 S.E.2d 111 (1984),

this Court recognized a public policy claim emanating from the common law right of privacy as a basis for a wrongful discharge involving an employee who refused to take an employer polygraph test. In syllabus point one of *Cordle*, we explained that "[a] determination of the existence of public policy in West Virginia is a question of law, rather than a question of fact for a jury."

We acknowledged the nebulous quality of the concept of "public policy" in *Yoho v. Triangle PWC, Inc.*, 175 W.Va. 556, 336 S.E.2d 204 (1985), as follows:

> The power to declare an action against public policy is a broad power and one difficult to define. "No fixed rule can be given to determine what is public policy. It is sometimes defined as that principle of law under which freedom of contract or private dealings are restricted by law for the good of the community—the public good." *Higgins v. McFarland*, 196 Va. 889, 894, 86 S.E.2d 168, 172 (1955).

175 W.Va. at 561, 336 S.E.2d at 209 (citations omitted).

The state constitutional right to petition for redress formed the basis for a retaliatory discharge action in *McClung v. Marion County Commission*, 178 W.Va. 444, 360 S.E.2d 221 (1987). The plaintiff, a dog warden for the county commission, had been suspended for five days for failing to respond to three telephone calls involving animals. *Id.* at 448, 360 S.E.2d at 225. Allegedly in response to the warden's claim for overtime wages, the commission terminated the warden. The lower court set aside a jury verdict for the warden, reasoning that the warden was an employee at-will. On appeal, this Court concluded that the state constitutional right to petition for redress satisfied the requirement of a substantial public policy underlying a retaliatory discharge action and explained as follows:

---

4. Scholars hail *Petermann v. International Brotherhood of Teamsters*, 174 Cal.App.2d 184, 344 P.2d 25 (1959), as the seminal case on the public policy exception to the at-will employment doctrine. In *Petermann*, the plaintiff at-will employee was subpoenaed to testify before a state legislative committee. Disregarding the employer's instructions to falsely testify, the plaintiff testified truthfully at the hearing and was discharged

upon his return to work. The *Petermann* court found for the plaintiff, deeming it "obnoxious to the interests of the state and contrary to public policy and sound morality to allow an employer to discharge any employee, whether the employment be for a designated or unspecified duration, on the ground that the employee declined to commit perjury, an act specifically enjoined by statute." *Id.* at 27.

One of the fundamental rights of an employee is the right not to be the victim of a "retaliatory discharge," that is, a discharge from employment where the employer's motivation for the discharge is in contravention of a substantial public policy.... Certainly it is in contravention of substantial public policies for an employer to discharge an employee in retaliation for the employee's exercising his or her state constitutional rights to petition for redress of grievances (*W. Va. Const.* Art. III, Sec. 16) and to seek access to the courts of this State (*W. Va. Const.* Art. III, Sec. 17) by filing an action ... for overtime wages. *Id.* at 450, 360 S.E.2d at 227. This Court stated:

A public officer or public employee, even one who serves at the will and pleasure of the appointing authority, may not be discharged in retribution for the exercise of a constitutionally protected right, unless a substantial governmental interest outweighs the public officer's or public employee's interest in exercising such right.

*Id.*

We further clarified the meaning of the phrase "substantial public policy" in *Birthisel v. Tri–Cities Health Services Corp.,* 188 W.Va. 371, 424 S.E.2d 606 (1992), explaining that requiring the presence of a substantial public policy with regard to a particular issue would serve to exclude claims based on insubstantial considerations. In syllabus point two of *Birthisel,* we discussed the sources from which a substantial public policy could be derived, as follows: "To identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions." In syllabus point three of *Birthisel,* we further elaborated: "Inherent in the term 'substantial public policy' is the concept that the policy will provide specific guidance to a reasonable person."

The plaintiff in *Birthisel,* a social worker, claimed that she had been discharged for failure to transfer data, involving some closed patient files, from various records onto a master treatment plan. She claimed that transfer of data, as ordered by her supervisor, would violate ethical standards regarding closed charts of patients with whom she had not had contact. "She feared that to do so would be to falsify the records and would constitute a violation of the West Virginia Social Work Code of Ethics...." *Id.* at 374, 424 S.E.2d at 609. The employer, however, testified that "the social workers were merely being asked to make sure that the records accurately reflected the course of treatment that the patient had received." *Id.* at 375, 424 S.E.2d at 609.

Locating no specific guidance in the applicable regulations, we found that the "general admonitions as to the requirement of good care for patients by social workers do not constitute the type of substantial and clear public policy on which a retaliatory discharge claim can be based." 188 W.Va. at 378, 424 S.E.2d at 613. "If such a general standard could constitute a substantial public policy, it would enable a social worker to make a challenge to any type of procedure that the worker felt violated his or her sense of good service." *Id.* Recognizing that "[a]n employer should not be exposed to liability where a public policy standard is too general to provide any specific guidance or is so vague that it is subject to different interpretations[,]" we concluded that the employee had failed to establish that her discharge contravened a substantial public policy. *Id.* at 377, 424 S.E.2d at 612.

In *Lilly v. Overnight Transportation Co.,* 188 W.Va. 538, 425 S.E.2d 214 (1992), we addressed the issue of a dismissal based upon an employee's refusal to operate a motor vehicle with unsafe brakes and found that a substantial public policy created a cause of action for wrongful discharge. The underlying statutory provisions enumerated "in specific detail the brake equipment required for all types of motor vehicles...." *Id.* at 541, 425 S.E.2d at 217. We concluded "that the legislature intended to establish a clear and unequivocal public policy that the public should be protected against the substantial danger created by the operation of a vehicle in such an unsafe condition as to endanger the public's safety." *Id.*

Public policy considerations involving the obligation to provide truthful testimony in a legal action were analyzed in *Page v. Columbia Natural Resources, Inc.*, 198 W.Va. 378, 480 S.E.2d 817 (1996). Basing our conclusions upon the rationales expressed in *Harless* and *Cordle*, we found "sufficient statutory support for a substantial public policy against dismissing an employee for truthfully testifying in relation to a legal action." 198 W.Va. at 386, 480 S.E.2d at 825. We further explained, in language equally applicable in the present case:

> We believe that this substantial public policy also meets the requirement of providing specific guidance to a reasonable person. Basic to the administration of justice is the search for the truth. Thus, a reasonable employer should be aware that any attempt to interfere with the process of obtaining truthful testimony, by either intimidating a potential witness/employee prior to his or her testimony or retaliating against such witnesses/employee thereafter, violates the clear and substantial public policy of this State.

*Id.* at 386–87, 480 S.E.2d at 825–26.

In *Tudor v. Charleston Area Medical Center, Inc.*, 203 W.Va. 111, 506 S.E.2d 554 (1997), we recognized that a substantial public policy emanating from a state regulation on hospital patient care provided the basis for a constructive discharge claim where the nurse plaintiff had been terminated after expressing concerns regarding staffing problems and patient safety. The plaintiff in *Tudor* maintained that a substantial public policy was embodied in a state regulation providing that "there shall be an adequate number of licensed registered professional nurses to meet ..." certain staffing requirements. *Id.* at 123, 506 S.E.2d at 566 (quoting W. Va.C.S.R. § 64–12–14.2.4 (1987)). Disagreeing with the employer's contention that the regulation was too vague to present a substantial public policy underlying the employee's claim, as in *Birthisel*, we found that the regulation did set "forth a specific statement of a substantial public policy which

contemplates that the hospital unit will be properly staffed to accommodate the regulation's directive...." 203 W.Va. at 124, 506 S.E.2d at 567.[5]

Foreign jurisdictions seeking to define the parameters of the public policy exception to the employment-at-will doctrine have utilized similar approaches. In *Meury v. Connie Kalitta Services/American International Airways, Inc.*, 181 F.3d 102, 1999 WL 357774 (6th Cir. May 20, 1999), for example, the plaintiff filed a wrongful discharge claim contending that the defendant airline had discharged him for reporting safety violations to the Federal Aviation Authority. The Court found that Michigan recognizes the public policy exception to the at-will employment doctrine under these circumstances because federal aviation regulations have the force and effect of law to impose on the discharged employee an inherent duty to report violations. *Id.* . at *2. An employee discharged for making such reports can be said to have refused to violate the law. *Id.*

Similarly, the Court of Appeals in Minnesota held that allegations of the discharge of an at-will employee based upon his refusal to violate the law regarding reporting of safety violations stated a cause of action under the public policy exception to the at-will doctrine. *Freidrichs v. Western Nat'l Mut. Ins. Co.*, 410 N.W.2d 62 (Minn.Ct.App.1987); *see also Barela v. C.R. England & Sons, Inc.*, 197 F.3d 1313, 1999 WL 1244490 (10th Cir.1999) (holding that employee had asserted clear and substantial public policy under Utah law when he raised concerns regarding whether employer's personnel practices violated state and federal commercial trucking regulations); *Liberatore v. Melville Corp.*, 168 F.3d 1326, 1331 (D.C.Cir.1999) (finding that public policy exception to at-will employment applied to claim of pharmacist that he was discharged due to his insistence that temperatures in drug storage areas be maintained in accordance with Federal and District of Columbia regulations); *Fingerhut v. Children's Nat'l Medical Ctr.*, 738 A.2d 799, 806 (D.C.1999) (concluding that police officer employed by

---

**5.** Justice Maynard dissented to the *Tudor* decision, reasoning that "[t]he substantial public policy exception certainly does not encompass every broad policy pronouncement found in the voluminous code of state regulations." 203 W.Va. at 115, 506 S.E.2d at 576.

**532**

medical center could claim wrongful discharge under public policy exception based upon allegation that he reported employer's alleged bribe of government official, assisted FBI in corruption investigation, and was terminated after informing the employer of pending arrests and his role in the investigation); *Green v. Ralee Eng'g Co.*, 19 Cal.4th 66, 78 Cal.Rptr.2d 16, 960 P.2d 1046, 1061 (1998) (recognizing that regulations can be valid public policy sources upon which to base wrongful discharge claims if regulations are consistent with terms and intent of authorizing statute); *Flores v. American Pharmaceutical Servs., Inc.*, 994 P.2d 455, 1999 WL 459567 (Colo.Ct.App.1999) (holding that employee terminated after overhearing coworker's insurance fraud and reporting incident to supervisor could use state insurance fraud statute as basis for public policy exception to at-will employment even where statute imposed no specific reporting duty); *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859 (Mo.Ct.App.1985) (holding that plaintiff stated cause of action for wrongful discharge where she reported violations of federal eyeglass testing regulations and was subsequently discharged); *Allum v. Valley Bank*, 114 Nev. 1313, 970 P.2d 1062 (1998) (finding violation of Nevada public policy where loan officer was terminated for refusing to process loans suspected of being in violation of Federal Housing Administration rules and regulations); *O'Sullivan v. Mallon*, 160 N.J.Super. 416, 390 A.2d 149 (1978) (finding cause of action for wrongful discharge based on public policy embodied in state medical practice regulations where x-ray technician was terminated for justifiably refusing to catheterize patient); *Deerman v. Beverly California Co.*, 135 N.C.App. 1, 518 S.E.2d 804, 808–10 (1999) (holding that nurse terminated because she advised patient's family that they should consider changing physicians could assert wrongful discharge claim based upon substantial public policy regarding requirement that nurses teach and counsel patients); *Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 381 S.E.2d 445, 447 (1989) (recognizing public policy exception where plaintiff truck driver alleged that he was constructively discharged after refusing to comply with employer's requirement to drive

in excess of hours permitted by federal Department of Transportation regulations and refusing to falsify logs regarding compliance with the regulations).

Employing the reasoning underlying the *Birthisel* conclusion and Justice Maynard's dissent in *Tudor*, other jurisdictions have encountered situations in which the underlying policy failed to qualify as a substantial public policy necessary to support a retaliatory discharge action. In *Daley v. Aetna Life and Casualty Co.*, 249 Conn. 766, 734 A.2d 112 (1999), for example, the court held that an at-will employee who claimed that she had been terminated in retaliation for criticizing her employer's failure to implement "family-friendly" policies had not established a wrongful discharge claim under the public policy exception to the at-will employment doctrine. *Id.* at 133. The court concluded that neither state nor federal medical leave acts required an employer to implement broad-based family friendly policies or to refrain from taking adverse action against an employee who insisted upon pursuing efforts to secure benefits such as work-at-home arrangements. *Id.* at 134; *see also Merck v. Advanced Drainage Systems, Inc.*, 921 F.2d 549 (4th Cir.1990) (holding that constructively discharged employee could not rely on state highway regulations where those regulations were not sufficiently specific to constitute clear public policy mandate); *Spierling v. First Am. Home Health Services, Inc.*, 737 A.2d 1250 (Pa.Super.1999) (declining to find public policy exception where nurse alleged that she was wrongfully terminated when she uncovered and reported past Medicare fraud where nurse was under no duty to search company's old and discarded files).

## III. Conclusion

We find that West Virginia Code of State Regulations § 3–5–3 clearly provides a substantial public policy sufficient to support a claim for wrongful discharge where an employee is discharged in retaliation for providing information, in compliance with the requirements of the regulation, to an investigator for the West Virginia Board of Barbers

and Cosmetologists. To conclude otherwise would be tantamount to condoning the discharge of an employee for unwillingness to lie to a public official to protect an employer. Permitting the Defendant in the present case to discharge the Plaintiff with impunity after the Plaintiff spoke the truth to an investigator, as clearly required by the regulation as well as the basic moral tenets of our society, would undermine the substantial public policy manifested within the regulation. "[T]he employer is not so absolute a sovereign of the job that there are not limits to his prerogative." *Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330, 1336 (1980).

The Defendants attempt to minimize the substantiality of this issue, characterizing this regulation of the practice of cosmetology as insufficiently substantial to create a cause of action for wrongful discharge. Such narrow analysis, however, begs the question and is essentially flawed. The regulation is specific in its imposition of a duty upon the Plaintiff "to assist in carrying out the provisions of this rule by reporting any violation to the Board or any of its duly authorized agents." W. Va.C.S.R. § 3–5–3.1. The societal interest in procuring the truth concerning violations of law is a substantial public policy embodied in the regulation. There is a substantial public interest in discouraging illegal behavior. The absence of specific language placing the employer on notice that the discharge of an employee for compliance with the regulation will subject the employer to liability for retaliatory discharge does not defeat the employee's claim.

█ We echo the concise sentiment expressed by the Arizona court in *Wagner v. City of Globe,* 150 Ariz. 82, 722 P.2d 250 (1986), that "employees should not be discharged because they performed an act that public policy would encourage, or refused to do that which public policy condemns." *Id.* at 256. We also concur with the summary provided by the Colorado court in *Martin Marietta Corp. v. Lorenz,* 823 P.2d 100 (Colo. 1992).

There is no question that the manifest public policy of this state is that neither an employer nor an employee should be permitted to knowingly perpetrate a fraud or deception on the federal or state government. A corollary of this policy is that an employee, whether at-will or otherwise, should not be put to the choice of either obeying an employer's order to violate the law or losing his or her job.

*Id.* at 109.

Having answered the certified question, this matter is dismissed from the docket of this Court.

Certified Question Answered.

Chief Justice MAYNARD dissents and files a dissenting Opinion.

MAYNARD, Chief Justice, dissenting.

(Filed Dec. 5, 2000)

I dissent because I do not believe that West Virginia Code of State Regulations § 3–5–3 provides a substantial public policy sufficient to support a claim for wrongful discharge.

The majority wrongly concludes that C.S.R. § 3–5–3 provides a substantial public policy solely because it creates an obligation to report a violation. However, a duty to report, standing alone, cannot constitute a substantial public policy. Courts must instead determine the purpose of the duty. In other words, what is the nature of the violation that people have a duty to report? C.S.R. § 3–5–3 creates a duty to report violations of the rules of the Board of Barbers and Cosmetologists, including, as here, a duty to report the practice of barbering and cosmetology without a license. The real issue, therefore, is whether the mandatory licensing of barbers and cosmetologists constitutes a substantial public policy. The clear answer must be "no."

As noted by the majority, the rule in this State is that an employer has an absolute right to discharge an at-will employee. This rule is subject to several exceptions one of which is that where an employer's motivation for the discharge is to contravene a substan-

tial public policy, then the employer may be liable to the employee for damages. This Court has limited this narrow exception to instances where employees were terminated for testifying truthfully in a legal action; reporting intentional violations of the West Virginia Consumer Credit and Protection Act; refusing to take a polygraph test; exercising their State constitutional rights; refusing to operate a motor vehicle with unsafe brakes; and reporting problems with staffing and patient safety in a hospital. These exceptions properly protect the public from threats to their health, financial well-being, or constitutional rights, and guarantee the effective operation of the legal system. Such weighty matters are in blatant contrast to the mandatory licensing of barbers and cosmetologists. I am not certain of all motivations behind the passage of this licensing provision, but I suppose a primary motivation is to protect the public from bad haircuts. While I deplore a bad haircut as much as the next person, I am confident that I can protect myself from a bad haircut without the government's assistance.

In sum, this case makes bad law because it establishes that a substantial public policy now can be found in the most obscure and petty State regulation and used to further erode the employment-at-will doctrine. When you consider that executive agencies churn out rules like Stephen King churns out novels, this is a scary development. Finally, I am wary of these duty-to-tell regulations. If such regulations are applied to ensure the public's safety and well-being, they are legitimate. When applied to provisions promulgated by the Board of Barbers and Cosmetologists, these regulations move us closer to Big Brother. Therefore, I dissent.