588 S.E.2d 406

**Nick WOUNARIS, Jr., Plaintiff Below, Appellant,**

v.

**WEST VIRGINIA STATE COLLEGE, Defendant Below, Appellee.**

No. 30845.

Supreme Court of Appeals of West Virginia.

Submitted April 15, 2003.

Decided May 7, 2003.

Concurring Opinion of Justice Albright May 29, 2003.

Lonnie C. Simmons, Esq., Rudolph L. DiTrapano, Esq., DiTrapano, Barrett & DiPiero, Charleston, West Virginia, Attorneys for Appellant.

Charles R. Bailey, Esq., John T. Molleur, Esq., Bailey & Wyant, Charleston, West Virginia, for Appellee.

PER CURIAM:

Appellant Nick Wounaris, Jr., an employee of appellee West Virginia State College, a public educational institution, filed a grievance after being fired. After an Administrative Law Judge ordered the appellee to reinstate Mr. Wounaris, the appellee fired him a second time and then appealed the order of reinstatement. Although West Virginia State College lost its appeal of the grievance, it never re-hired Mr. Wounaris. Appellant Wounaris sued, alleging retaliatory discharge, but the jury found for the College. Mr. Wounaris now appeals, and for the reasons set forth below, we reverse.

I.

FACTS

We note that this case was argued as part of an educational program for school stu-

dents, called LAWS.[1] Because this case was argued as a part of this program, the opinion has been written so that it might be more easily understood by the students who participated. Many footnotes are provided to explain legal terms to those who might not understand them, and some facts are explained in greater detail than in an ordinary opinion.[2]

Mr. Nick Wounaris, Jr., the appellant, or person who filed this appeal, started working for appellee West Virginia State College ("the College") on March 1, 1985, when the College hired Mr. Wounaris to served as its Director of Fiscal Affairs. After several years working at the College, Mr. Wounaris gained a promotion to the position of Assistant Vice President for Administrative Affairs on August 1, 1995. Both sides agree that this was not a tenured position[3] at the College but was instead a so-called "at will" position. Each year Mr. Wounaris would sign a document called a "Notice of Appointment" that made clear that his job was an administrative appointment and that he served at the will and pleasure of the President of the College. The document provided that Mr. Wounaris could quit, or the College could terminate him, with thirty days written notice.

At some point, Mr. Wounaris became unhappy with his position at the College and he met with the College's president, Dr. Hazo W. Carter, Jr., to discuss his dissatisfaction sometime in September 1998. When the College took no immediate action on his complaints, Mr. Wounaris delivered a letter to Dr. Carter's office on October 5, 1998. In that letter, Mr. Wounaris explained that he was dissatisfied with several of his job duties, his job title, his salary, and several other issues. Mr. Wounaris, who is white, also said in the letter that he believed that he was the victim of "reverse racial discrimination."

In that letter, Mr. Wounaris made several demands, including a new job title, a raise of $20,000, and significant changes in his job duties. Apparently Mr. Wounaris believed that many other people received promotions instead of him, and that if he had been promoted fairly he would already be making $20,000 a year more. Mr. Wounaris said in his letter that, if the College did not do what he asked, he would file complaints with the Human Rights Commission,[4] the Ethics Commission,[5] and that he would also file a

1. The LAWS project, an acronym for Legal Advancement for West Virginia Students, is a West Virginia Supreme Court of Appeals initiative designed to educate high school students about the judicial branch of government. Participating students have an opportunity to attend a Supreme Court session in their own, or a nearby, community. The Supreme Court is proud to have educated more than 1,400 students through LAWS since the program began in 1999.

2. The explanatory footnotes in this opinion, those that do not quote a statute or opinion of this Court, are provided largely to help students understand this case, and should not be cited by future litigants as being illustrative of the state of the law on a given issue.

3. Unlike a person with an "at-will" job, a person in tenured position can expect his or her job to continue every year.

4. The Human Rights Commission, created by W. Va.Code § 5-11-1, et seq., is charged with the duty to:
   encourage and endeavor to bring about mutual understanding and respect among all racial, religious and ethnic groups within the state and shall strive to eliminate all discrimination in employment and places of public accommo-

dations by virtue of race, religion, color, national origin, ancestry, sex, age, blindness or handicap and shall strive to eliminate all discrimination in the sale, purchase, lease, rental or financing of housing and other real property by virtue of race, religion, color, national origin, ancestry, sex, blindness, handicap or familial status.
W. Va.Code § 5-11-4 (2001).

5. The Ethics Commission, created by W. Va.Code § 6B-1-1, et seq., is charged with the duty to:

   maintain confidence in the integrity and impartiality of the governmental process in the state of West Virginia and its political subdivisions and to aid public officials and public employees in the exercise of their official duties and employment; to define and establish minimum ethical standards for elected and appointed public officials and public employees; to eliminate actual conflicts of interest; to provide a means to define ethical standards; to provide a means of investigating and resolving ethical violations; and to provide administrative and criminal penalties for specific ethical violations herein found to be unlawful.
   W. Va.Code § 6B-1-2 (1989).

lawsuit in the circuit court in which he would ask for $200,000 in compensatory damages and $2,000,000 in punitive damages. Also on that same day, October 5, 1998, Mr. Wounaris delivered another letter to his immediate supervisor, Dr. Cassandra Whyte, in which he said many of the same things he said in the first letter, and also demanded a written warning to a co-worker whom Mr. Wounaris believed to be acting in an unprofessional and racist manner toward him.

Three days later, on October 8, 1998, Dr. Whyte met with Mr. Wounaris and gave him a letter that said his employment with the College was terminated "effectively immediately" and that he would only be paid through the end of the next month, November 30, 1998. The letter explained that the College had "lost confidence" in Mr. Wounaris' ability to perform his duties and that as a result, he could no longer work there.

The parties disagree about what happened next.[6] Mr. Wounaris claims that he requested, to no avail, an informal conference to discuss his termination with Dr. Whyte and Dr. Carter the day he received the letter, which would be the first step in the grievance process. Mr. Wounaris also wrote to several officials at the College, asserting claims of discrimination and asking for his grievance to be heard. Mr. Wounaris officially filed a grievance, on a particular form provided by the College, on December 9, 1998.

The Administrative Law Judge (abbreviated "ALJ") assigned to the case found that Mr. Wounaris had attempted to start the grievance process, that the College failed to respond, and that as a result the College was in default, as described by W. Va.Code § 18–29–3(a) (1992). The ALJ determined that,

because Mr. Wounaris' claim of "reverse discrimination," if true, would be a claim involving a substantial public policy,[7] and because the College had defaulted, the ALJ was required to presume that Mr. Wounaris had prevailed on the merits of his grievance.[8] After finding no authority to redefine Mr. Wounaris' duties or to provide him with a raise, the ALJ ordered the College to reinstate Mr. Wounaris to his former position, and pay him back pay and benefits, plus interest, from the effective date of his termination. The ALJ entered this order on May 18, 1999.

The College then took two courses of action. On May 19, 1999, Dr. Whyte wrote Mr. Wounaris another letter, again terminating his employment with the College. The College then pursued an appeal of the ALJ's order of reinstatement. Specifically, the College filed an appeal in the Circuit Court of Kanawha County on May 25, 1999. After several hearings in circuit court, the College petitioned this Court requesting a stay of the ALJ order, which this Court denied on September 23, 1999. After several more rounds of motions and hearings, the lower court finally entered an order on January 4, 2000, affirming the ALJ's order of reinstatement. The College appealed the final order to this Court, which refused the petition of the College by order dated July 6, 2000. Although seemingly victorious at this stage in the process, Mr. Wounaris had been terminated, for the second time, back on May 19, 1999.

In response to his second termination, Mr. Wounaris filed a second grievance on August 20, 1999. Mr. Wounaris lost at levels I and II, and the College waived the Level III hearing so the matter proceeded to level IV, a hearing before an Administrative Law

**6.** Because Mr. Wounaris worked for West Virginia State College, a public institution, he had the right to file what is called a "grievance" pursuant to W. Va.Code § 18–29–1, *et seq.* Filing a grievance is not possible with every job, but when it is, a person who thinks he or she is treated unfairly, or fired for an improper reason, can file an official complaint, called a "grievance." The grievance process has several steps. The first step is to request a meeting with your supervisors, and it moves on to other steps until a special judge called an Administrative Law Judge or a Hearing Examiner hears the case. If you don't like the ruling that judge gives you, you

can appeal to the circuit court, and eventually to this Court.

**7.** This means that an employee will not always win his or her grievance just because the employer missed a deadline or failed to respond. The employee only wins "by default" when the employer has done certain things wrong.

**8.** This means that the ALJ did not actually weigh the evidence and decide that Mr. Wounaris was right; instead, the ALJ had to presume that Mr. Wounaris was right.

Judge. On May 15, 2000, the ALJ ruled against Mr. Wounaris, finding that although he had presented a *prima facie* case of reprisal, the College had established legitimate, non-retaliatory reasons for terminating Mr. Wounaris.[9]

Meanwhile, on October 19, 1999, with the second grievance still pending, Mr. Wounaris filed a new and separate lawsuit in the Circuit Court of Kanawha County, alleging that the College had fired him in retaliation for filing the first grievance.[10] Almost two years passed before the trial in this case actually took place. Meanwhile, various courts considered the other aspects of this case.[11] Eventually, on September 21, 2001, a jury found against Mr. Wounaris and for the College. A verdict form returned by the jury showed that the jury did not think that Mr. Wounaris proved that the College had fired him for improper reasons. That is, Mr. Wounaris was unable to convince the jury that the College fired him the second time in retaliation for his filing the first grievance, or for any other impermissible reason. Mr. Wounaris moved for a new trial, which the lower court denied by order dated November 27, 2001. It is from this order that Mr. Wounaris now appeals.

## II.

### STANDARD OF REVIEW

Mr. Wounaris argues that the lower court failed to instruct the jury properly and should have granted his motion for a new trial. As this Court has explained:

> We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factu-

al findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

*Tennant v. Marion Health Care Foundation,* 194 W.Va. 97, 104, 459 S.E.2d 374, 381 (1995); *accord,* syl. pt. 2, *in part, Walker v. West Virginia Ethics Commission,* 201 W.Va. 108, 492 S.E.2d 167 (1997). Although this standard favors the decisions made by the lower court, we have cautioned that this discretion is not without limit: "We grant trial court judges wide latitude in conducting the business of their courts. However, this authority does not go unchecked, and a judge may not abuse the discretion granted him or her under our law." *Lipscomb v. Tucker County Com'n.,* 206 W.Va. 627, 630, 527 S.E.2d 171, 174 (1999).

Mr. Wounaris has placed the jury instructions at issue in this case, but whether or not the jury received the proper instruction necessarily implicates a question of law. The Court has stated that:

> Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.

Syl. pt. 4, *Sanders v. Georgia–Pacific Corp.,* 159 W.Va. 621, 225 S.E.2d 218 (1976). *Accord, Stillwell v. The City of Wheeling,* 210 W.Va. 599, 604, 558 S.E.2d 598, 603 (2001); syl. pt. 1, *Andrews v. Reynolds Memorial Hosp., Inc.,* 201 W.Va. 624, 499 S.E.2d 846 (1997). Syl. pt. 1, *Foster v. Sakhai,* 210 W.Va. 716, 559 S.E.2d 53 (2001).

Because we are asked to consider whether the members of the jury received the proper instructions in this case, our re-

---

9. This means that Mr. Wounaris had shown enough evidence that it looked like, at first, Mr. Wounaris was right, but that the College was able to show that it had other valid, permissible reasons to fire him again.

10. This is complicated because Mr. Wounaris is basically saying that the College fired him the second time because he had filed a grievance when it fired him the first time. He also argues, however, that the original reasons for his firing were not legitimate reasons either.

11. If the reader is somewhat lost, that confusion is understandable. We note that, at the same time that the second grievance was pending and around the time Mr. Wounaris had filed his lawsuit in circuit court, the College was still appealing the decision of the ALJ in the *first* grievance from May 1999 through July of 2000. The ALJ did not rule against Mr. Wounaris in the *second* grievance until May 15, 2000.

view is *de novo* with respect to this specific issue: "As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo*." Syl. pt. 1, *State v. Hinkle,* 200 W.Va. 280, 489 S.E.2d 257 (1996). Or stated another way, "[o]f course, our review of the legal propriety of the trial court's instructions is *de novo.*" *Skaggs v. Elk Run Coal Co., Inc.,* 198 W.Va. 51, 63, 479 S.E.2d 561, 573 (1996) (citation omitted); *accord, Gillingham v. Stephenson,* 209 W.Va. 741, 745, 551 S.E.2d 663, 667 (2001) (*per curiam* ). Bearing all this in mind, we turn to a discussion of the instant case.

## III.

## DISCUSSION

█ The basic issue in this case is whether or not it was "wrong" for the College to fire Mr. Wounaris the second time, the day after an administrative law judge had ordered the College to give him his job back. Mr. Wounaris first argues that the trial court made an error when it refused to hold that the College had violated the May 18, 1999 reinstatement order when it fired him the second time. More specifically, Mr. Wounaris claims that the judge should have instructed the jury that the College was in violation of the May 18 order. Instead the judge allowed the jury to consider this question, and they found against Mr. Wounaris.

█ The College argues that the judge acted correctly and gave the jury the correct instructions. The College notes that the jury received an instruction that allowed them to infer from the timing of the second firing that the College had an improper motive. Essentially, Mr. Wounaris wants the Court to hold that an employer cannot fire an employee once a judge has ordered that employee's reinstatement, or at least not until the grievance and appeals processes have run their course. The College wants the Court to hold that once an at-will employee has returned to work, he or she is still "at-will" and can be fired immediately, if the employer finds it necessary or desirable to do so. The

Court has explained that there are limitations on an employer's ability to fire an employee in certain situations:

> The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy princip[le], then the employer may be liable to the employee for damages occasioned by this discharge.

Syllabus, *Harless v. First National Bank in Fairmont,* 162 W.Va. 116, 246 S.E.2d 270 (1978). This Court has noted that the outlines of "public policy" are elusive, describing the concept as both "nebulous," see, *Kanagy v. Fiesta Salons, Inc.,* 208 W.Va. 526, 529, 541 S.E.2d 616, 619 (2000), and "hard to define," see, *Yoho v. Triangle PWC, Inc.,* 175 W.Va. 556, 561, 336 S.E.2d 204, 209 (1985). However, we have made some efforts to describe why a "public policy" exception to the "at-will" doctrine is necessary:

> The basic rule that an employer has an absolute right to discharge an at-will employee has been subjected to several exceptions by this Court, one of which is that where an employer's motivation for the discharge is to contravene a substantial public policy, then the employer may be liable to the employee for damages. A review of these exceptions indicates that generally they were created to protect the public from threats to its health, financial well-being, or constitutional rights, or to guarantee the effective operation of the legal system. The rationale underlying each exception is that protecting the employee from discharge is necessary to uphold a substantial public interest.

*Feliciano v. 7–Eleven, Inc.,* 210 W.Va. 740, 751, 559 S.E.2d 713, 724 (2001) (Maynard, J., dissenting).

█ Many of the recent cases in this area of the law draw support from this Court's decisions in *Skaggs v. Elk Run Coal Co., Inc.,* 198 W.Va. 51, 479 S.E.2d 561 (1996) and *Page v. Columbia Natural Res., Inc.,* 198 W.Va. 378, 480 S.E.2d 817 (1996). In *Skaggs,* the Court considered the case of a disabled veteran who alleged that his employer fired him, at least in part, because of

his disability. The *Skaggs* Court conducted a thorough analysis of the discrimination law, including the leading federal case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and held that:

> In disparate treatment discrimination cases under the West Virginia Human Rights Act, W. Va.Code, 5–11–9 (1992), a plaintiff proves a claim for unlawful discrimination if he or she proves by a preponderance of the evidence that a forbidden intent was a motivating factor in an adverse employment action. Liability will then be imposed on a defendant unless it proves by a preponderance of the evidence that the same result would have occurred even in the absence of the unlawful motive.

Syl. pt. 6, *Skaggs v. Elk Run Coal Co., Inc.,* 198 W.Va. 51, 479 S.E.2d 561 (1996). *Page,* decided about the same time, considered the case of a woman who claimed to have been fired because of her testimony in a legal proceeding. Building on the decision in *Skaggs,* the *Page* Court held:

> Once the plaintiff in an action for wrongful discharge based upon the contravention of a substantial public policy has established the existence of such policy and established by a preponderance of the evidence that an employment discharge was motivated by an unlawful factor contravening that policy, liability will then be imposed on a defendant unless the defendant proves by a preponderance of the evidence that the same result would have occurred even in the absence of the unlawful motive.

Syl. pt. 8, *Page v. Columbia Natural Res., Inc.,* 198 W.Va. 378, 480 S.E.2d 817 (1996).

■ In a more recent case concerning a convenience store employee who was terminated after successfully disarming a robber at the store, the Court was asked to consider whether the right to self-defense should have prevented the store from firing the employee. The Court decided the question in favor of the employee, holding:

> When an at will employee has been discharged from his/her employment based upon his/her exercise of self-defense in response to lethal imminent danger, such right of self-defense constitutes a substantial public policy exception to the at will employment doctrine and will sustain a cause of action for wrongful discharge.

Syl. pt. 8, *Feliciano v. 7–Eleven, Inc.,* 210 W.Va. 740, 559 S.E.2d 713 (2001). The Court went on to explain that, once an employee has demonstrated that he or she may have been fired for exercising the right to self-defense, the employer has an opportunity to show it fired the employee for other, legitimate reasons:

> An employer may rebut an employee's *prima facie* case of wrongful discharge resulting from the employee's use of self-defense in response to lethal imminent danger by demonstrating that it had a plausible and legitimate business reason to justify the discharge.

*Id.,* syl. pt. 9, 559 S.E.2d 713.

The Court has sometimes struggled with just what constitutes a substantial public policy issue that would prevent an at-will employee from being fired. In a case concerning a wrongful discharge claim brought by a cosmetologist against the hair salon where she had worked, this Court conducted a thorough review of other cases to determine "what constitutes a sufficiently clear embodiment of public policy" to limit an employer's right to terminate an at-will employee. *Kanagy v. Fiesta Salons, Inc.* 208 W.Va. 526, 529, 541 S.E.2d 616, 619 (2000). The *Kanagy* opinion notes that the Court has found a public policy reason to limit the usual right of an employer to fire an at-will employee when that firing would violate important rights of the employee. For example, the Court has found that public policy considerations prevent terminating an employee who refused to take a polygraph test (see *Cordle v. General Hugh Mercer Corp.,* 174 W.Va. 321, 325 S.E.2d 111 (1984) (right to privacy)), terminating a dog warden who made a claim for overtime wages not paid to him (see *McClung v. Marion County Commission,* 178 W.Va. 444, 360 S.E.2d 221 (1987)) (right to seek redress of grievances and seek access to the courts), or, as discussed above, terminating a convenience store employee for defending himself against a robber (see *Feliciano v. 7–Eleven, Inc.,* 210 W.Va. 740, 559 S.E.2d 713 (2001)) (right to self defense).

The *Kanagy* Court also went on to hold in favor of the employee.[12]

■ The Court does not conjure these so-called public policy concerns out of thin air. We have explained that one must draw from many sources when considering whether a dispute implicates a substantial public policy interest: "To identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions." Syl. pt 2, *Birthisel v. Tri-Cities Health Services Corp.*, 188 W.Va. 371, 424 S.E.2d 606 (1992).

■ Applying this point to the facts of this case, we note that Mr. Wounaris, when employed by the College, was subject to the requirements of W. Va.Code § 18–29–1, *et seq.*, which establishes a grievance procedure for, among others, employees of state institutions of higher learning. The Legislature has provided an explanation of the purpose of this statute:

> The purpose of this article is to provide a procedure for employees of the governing boards of higher education, state board of education, county boards of education, regional educational service agencies and multi-county vocational centers and their employer or agents of the employer to reach solutions to problems which arise between them within the scope of their respective employment relationships to the end that good morale may be maintained, effective job performance may be enhanced and the citizens of the community may be better served. This procedure is intended to provide a simple, expeditious and fair process for resolving problems at the lowest possible administrative level and shall be construed to effectuate this purpose.

W. Va.Code § 18–29–1 (1992). We believe that the Legislature intended employers and employees to be encouraged, and not discouraged, from using this process.

In addition to this Legislative guidance, this Court has added that: "The legislative intent expressed in W. Va.Code, 18–29–1 (1985), is to provide a simple, expeditious and fair process for resolving problems." Syl. pt. 3, *Spahr v. Preston County Board of Education*, 182 W.Va. 726, 391 S.E.2d 739 (1990). We glean from the above that the grievance process contained in W. Va.Code § 18–29–1, *et seq.*, advances a substantial public purpose, and that public policy considerations demand that an employer not be permitted to violate the rights an employee enjoys under this process.

■ The ALJ determined that the College defaulted on its obligations in the grievance process and that, as a result, it had to be presumed that Mr. Wounaris prevailed on the merits of his claim.[13] While the Court refused the direct appeal of this finding, we do note that the Court has held previously:

> W. Va.Code § 18–29–3(a) (1992) (Repl. Vol.1994) makes mandatory the time periods within which grievances by educational employees must be filed, heard, and decided. If a grievance evaluator does not comply with the hearing and decision time periods, and his/her inaction does not come *within* one of the enumerated statutory exceptions, "the grievant shall prevail by default."

Syl. pt. 3, *Hanlon v. Logan County Board of Education*, 201 W.Va. 305, 496 S.E.2d 447 (1997); *accord, Harmon v. Fayette County Bd. of Educ.*, 205 W.Va. 125, 135, 516 S.E.2d 748, 758 (1999).

As Mr. Wounaris states in his argument, the ALJ decided in his favor and commanded his reinstatement in the May 18, 1999 order. The College then appealed this ruling, as was its right. However, the College also immediately fired Mr. Wounaris again, in spite of the order. We believe that the record in this

---

12. Specifically the Court held:
West Virginia Code of State Regulations § 3–5–3 clearly provides a substantial public policy sufficient to support a claim for wrongful discharge where an employee is discharged in retaliation for providing truthful information, in compliance with the requirements of the regulation, to an investigator for the West Virginia Board of Barbers and Cosmetologists. Syl. pt. 5, *Kanagy v. Fiesta Salons, Inc.*, 208 W.Va. 526, 541 S.E.2d 616 (2000).

13. See footnote 8, above.

case clearly establishes that Mr. Wounaris is a public employee protected by a grievance procedure. Furthermore, it is clear from expressions of legislative intent and the case law that this procedure exists in support of the substantial public purpose "that good morale may be maintained, effective job performance may be enhanced and the citizens of the community may be better served." W. Va.Code § 18–29–1 (1992).

We find the decision in *Feliciano, supra,* to be helpful in deciding the instant case. The *Feliciano* Court concluded:

[T]he right of self-defense in response to lethal imminent danger is a substantial public policy exception to the at will employment doctrine and will support a cause of action for wrongful discharge. An aggrieved employer may then rebut the presumption of a wrongful discharge by demonstrating that it had a plausible and legitimate business reason for terminating its employee.

*Feliciano* 210 W.Va. at 750–51, 559 S.E.2d at 723–24. We conclude that a similar result is appropriate in the instant case.

We believe that the actions of the College in this case, where an ALJ ordered Mr. Wounaris' reinstatement, and in response the College re-hired him and then immediately terminated him even before the appeals process had run its course, present a clear violation of public policy. Because we have determined that an employer, under these circumstances and in the absence of some significant, novel reason, cannot terminate an employee in the middle of a grievance proceeding, we must reverse the decision of the lower court. To hold otherwise would be to make a mockery of the grievance process and leave an employee who had won reinstatement with a Pyrrhic victory,[14] at best.

■ Furthermore, this Court has noted that: "A determination of the existence of public policy in West Virginia is a question of

law, rather than a question of fact for a jury." Syl. pt. 1, *Cordle v. General Hugh Mercer Corp.,* 174 W.Va. 321, 325 S.E.2d 111 (1984); *accord, Page v. Columbia Natural Res., Inc.,* 198 W.Va. 378, 480 S.E.2d 817 (1996). In the instant case, we believe that the lower court made two significant errors; first the court erred in not finding Mr. Wounaris' second firing to be a violation of the grievance process, and thus a violation of public policy; second, the court compounded its first error by not instructing the jury to presume the second firing was impermissible. While it is true that the court offered an instruction that allowed the jury to infer an improper motive from the timing of the second firing, we do not believe this was sufficient.

■ Because we have determined that, under the facts of this case, the firing of Mr. Wounaris before the completion of the grievance process was simply not permissible, we conclude that the jury in this case was not properly instructed. Although offered an opportunity to infer an improper motive on the part of the College, we believe that the jury instead should have been told to presume such an improper motive, in the absence of some significant and novel reason for the termination.[15] We recognize that the court could not possibly have anticipated the specifics of our ruling in this case. Nonetheless, we find it necessary to reverse.

Having said this, we are not holding that any employee who has filed a grievance or alleged a wrongful discharge is immune from termination. Obviously, as the College and the trial court noted, there are hypothetical circumstances under which an employer could terminate an employee before the grievance process has concluded, even in the face of an order of reinstatement. We leave it to the fertile imaginations of future litigants what those circumstances might be. However, we note that the reasons an em-

---

**14.** Pyrrhus was the King of Epirus, an area of Greece, who sustained such heavy losses when he defeated the Romans in a battle that the term "Pyrrhic Victory" has come to mean a victory that is costly to the point of negating or outweighing expected benefits.

**15.** We note that the College claims to have acted upon information about Mr. Wounaris' *prior* conduct acquired by the College after his first termination, and/or Mr. Wounaris's conduct *after* his first termination. We do not find the facts alleged sufficiently persuasive to affect our holding in this case, although a jury may find otherwise.

ployer must supply for discharging a public employee, in spite of a reinstatement order and before the termination of the grievance process, must be extremely persuasive. The Court has stated that:

> A public officer or public employee, even one who serves at the will and pleasure of the appointing authority, may not be discharged in retribution for the exercise of a constitutionally protected right, unless a substantial governmental interest outweighs the public officer's or public employee's interest in exercising such right.

*McClung v. Marion County Comm'n*, 178 W.Va. 444, 450, 360 S.E.2d 221, 227 (1987) (citations omitted). While our decision in this case does not rest upon a constitutional analysis, the point made by the Court in *McClung* provides a useful analogy. The reason for firing an employee, under the circumstances presented in this case, would have to clearly outweigh the public policy interest of maintaining the integrity of the grievance process.

We do not believe that this case presents circumstances that justified the firing of Mr. Wounaris before the College had exhausted its appeals in the grievance process. The College suggests that by ruling this way we may create a class of what it calls "super-protected" employees who can never be fired once they have filed a grievance. In essence, the College asks, if an employer cannot, ordinarily, fire an employee who has won reinstatement until the grievance process has reached its conclusion, when, then, can such an employee be fired?

We appreciate the logic of the College's position, but we do not find it necessary to answer such a question in this opinion. We find it sufficient to hold that the public policy interest of encouraging participation in the public employee grievance process is sufficient to prohibit the College's specific conduct in this particular case. Accordingly, we reverse the decision of the lower court, and remand this case for a new trial. At the new trial, Mr. Wounaris should benefit from a presumption that the College acted in violation of law when it terminated him the second time. The College should enjoy an opportunity to rebut that presumption.[16]

## IV.

## CONCLUSION

For the reasons stated, the order of the Circuit Court of Kanawha County is reversed, and this case is remanded to the circuit court for proceedings consistent with this opinion.

Reversed and remanded.

STARCHER, Chief Justice, dissenting:

I dissent because the jury, after hearing all of the evidence, had every opportunity to rule for Mr. Wounaris—if they thought he had been treated illegally or unfairly.

The judge in this case told the jury that they could find that firing Mr. Wounaris a second time, while his appeal of the first grievance was pending, was grounds for Mr. Wounaris winning the lawsuit. Therefore, if the jury had thought that the College did not have good grounds for the second firing, the jury would have ruled for Mr. Wounaris.

But instead, the jury found for the College—and found that the second firing was permissible.

Why? The obvious reason (a reason that is not mentioned in the majority opinion) is that several members of the College staff came

---

**16.** Mr. Wounaris also argues that the lower court erred by not instructing the jury that it should consider an award of punitive damages in this case. The jury's decision rendered that issue essentially moot in the trial below. However, we share Mr. Wounaris' concern that the trial court may have placed inappropriate weight on the College's claim that it was simply relying upon the advice of counsel when it terminated him. We point out that:

> In an employment law civil action, the fact that an employer acted in reliance upon the advice of counsel is not an absolute defense to a claim that the employer acted unlawfully or negligently. Relevant evidence regarding the advice of counsel may be admissible in the trial of an employment law civil action as part of the calculus of evidence that the fact finder considers in reaching its verdict—including on the issue of punitive damages, where that issue is presented.

Syl. pt. 2, *Sheetz, Inc. v. Bowles, Rice, McDavid, Graff & Love, PLLC*, 209 W.Va. 318, 547 S.E.2d 256 (2001).

forward after the first firing, and reported new facts about Mr. Wounaris. These new facts showed the College—and the jury—that there were other good reasons for firing Mr. Wounaris, in addition to the rather outrageous job demands that led to his first firing.

These new facts included Mr. Wounaris' frequently leaving his office for hours at a time. During these excursions, Mr. Wounaris would give his assistants phone numbers where he could be reached. The phone numbers turned out to be for "The Plaza Colonial Room," "J.J.'s Lounge & Billiards," and "The Goal Line."

In other words, Mr. Wounaris was leaving work during the day and hanging out at bars. (His car was also seen parked outside a bar during work hours.)

When the jury heard about this behavior, they—like the College—had a good reason to conclude that Mr. Wounaris was a man who had no right to claim he had been treated unfairly, and that he deserved to be fired a second time.

The majority opinion is correct in saying that we need to encourage people to follow grievance procedures, and the majority thankfully does not create a class of "super-protected" employees who simply cannot be fired while a grievance procedure is pending, even on appeal.

But a retrial of this case is not needed. The next jury will also have the right to find for the College—even though Mr. Wounaris was fired "on the same day" he was supposed to be reinstated—if that second jury concludes that the "presumption" of a motive that violates public policy has been rebutted.

That is exactly the option that the first jury had. So there is no need for a retrial for Mr. Wounaris to have a fair trial. He already had a fair trial, and he lost.

To summarize: this case was well-tried. The College took on the challenge of showing a jury why they fired a man twice, even after he was reinstated. The College was successful before a jury. Mr. Wounaris had a fair chance to present his side of events, and he was not successful.

I would affirm the jury's verdict. I am authorized to say that Justice Davis joins in this dissenting opinion.

Chief Justice STARCHER and Justice DAVIS dissent and reserve the right to file dissenting opinions.

Justice ALBRIGHT concurs and reserves the right to file a concurring opinion.

ALBRIGHT, Justice, concurring:

(Filed May 29, 2003)

I concur entirely in the judgment rendered by the majority opinion and the reasons stated in support of that judgment. I write separately only to emphasize two points raised in that opinion.

First, an at-will public employee would not typically have a legitimate basis for filing a grievance with respect to his or her discharge. In the absence of an allegation that the employee's discharge breached a specific statutory right or that the discharge constituted a violation of public policy, an at-will public employee is bound by the at-will nature of the employment and cannot contest that discharge using the grievance process.

The case before us arose in the first instance by reason of alleged violation of the rights of a member of a protected class under the West Virginia Human Rights Act. As the case came before us it also involved an allegation that the second discharge of Mr. Wounaris constituted an attempt to frustrate the grievance procedure. While these allegations rest initially on rights created and prescribed by statute, they also should be seen as testing the vitality of basic tenets of the public policies the respective statutes were designed to promote and protect, i.e., strongly discouraging racial discrimination and protecting public employees from arbitrary and capricious treatment.

This Court stated the public policy exception to at-will employment for all employees, public or private, in the syllabus of *Harless v. First National Bank in Fairmont,* 162 W.Va. 116, 246 S.E.2d 270 (1978): "The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the em-

ployer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge." In *McClung v. Marion County Commission*, 178 W.Va. 444, 360 S.E.2d 221 (1987), this Court explained as follows:

> One of the fundamental rights of an employee is the right not to be the victim of a "retaliatory discharge," that is, a discharge from employment where the employer's motivation for the discharge is in contravention of a substantial public policy .... Certainly it is in contravention of substantial public policies for an employer to discharge an employee in retaliation for the employee's exercising his or her state constitutional rights to petition for redress of grievances (*W. Va. Const.* Art. III, § 16) and to seek access to the courts of this State (*W. Va. Const.* Art. III, § 17) by filing an action ... for overtime wages.

*Id.* at 450, 360 S.E.2d at 227.

Second, I wish to underline that the majority opinion rendered in this case *does not* stand for the proposition that a public employee *may not under compelling circumstances* be discharged while a grievance filed by that employee is pending. The sad fact is that no such *compelling* circumstances appear in the record of the case before us, and one is left with the strong impression that the second discharge occurred primarily to frustrate the grievance process and its underlying public policy. In my judgment, that realization, more than any other, justifies the conclusion that the judgment of the lower court should be reversed.

Accordingly, I concur in the opinion and judgment rendered by the majority.